UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————X

INNOVATIVE BIODEFENSE, INC.,                    :
                                                :
                      Plaintiff,                :
                                                :          **OPINION AND ORDER**
              - against -                       :
                                                :          12 Civ. 3710 (ER)
VSP TECHNOLOGIES, INC., SAN-MAR                 :
LABORATORIES, INC., and CARLO MICCERI,          :
                                                :
                      Defendants.               :
———————————————————————X
VSP TECHNOLOGIES, INC., and                     :
CARLO MICCERI,                                  :
                      Third Party Plaintiffs,   :
                                                :
              - against -                       :
                                                :
BDS SOLUTIONS, LLC, BDS                         :
TECHNOLOGIES, LLC, and BIODEFENSE               :
INTERNATIONAL, INC.,                            :
                                                :
                      Third Party Defendants.   :
———————————————————————X

        This action stems from a series of agreements governing the sublicense of patented

technology used to manufacture antimicrobial products, including hand sanitizer.  Plaintiff

Innovative Biodefense, Inc. ("IBD" or "Plaintiff") brought this action against VSP Technologies,

Inc. ("VSP"), San-Mar Laboratories, Inc. ("San-Mar"), and Carlo Micceri ("Micceri," and

collectively "Defendants") alleging, *inter alia*, breach of the agreements to sublicense the

patented technology.  VSP brought counterclaims against IBD and a third party complaint

against Third Party Defendants BDS Solutions, LLC, BDS Technologies, LLC and BioDefense

International, Inc. (collectively "BDS") also for, *inter alia*, breach of the same sublicensing

agreements.  IBD moved for summary judgment to dismiss VSP's counterclaims against it and

Defendants counter-moved for both summary judgment of their counterclaims and to dismiss

IBD's claims.  For the reasons discussed below, IBD's motion is GRANTED in part and DENIED in part while Defendants' motion is DENIED in its entirety.

## I.  Background

### a.  The Parties

IBD is a California corporation that develops, manufactures, and sells antimicrobial products, including skincare and cleansing products.  Pl.'s Statement of Undisputed Facts in Supp. of its Mot. for Summ. J. (Doc. 175) ("Pl.'s 56.1") ¶ 1.  Colette Cozean ("Cozean") is IBD's President and Chief Executive Officer.  Defs.' Statement of Undisputed Facts in Supp. of its Cross-Mot. for Summ. J. (Doc. 184) ("Defs.' 56.1") ¶ 10.  Gary Klein ("Klein") is IBD's Vice-Chair, Chief Operating Officer, and Vice President of International Sales.  Decl. of Klein in Supp. of Pl.'s Mot. for Summ. J. (Doc. 176) ("Klein Decl.") ¶ 1.

VSP is a New York corporation that licenses and markets various technologies, but does not itself manufacture or sell any product.  Pl.'s 56.1 ¶ 2; Defs.' 56.1 ¶ 28.  VSP was incorporated to secure a master license from Columbia University for its patented antimicrobial formulas.  Defs.' 56.1 ¶ 4.  Columbia University granted VSP exclusive rights to develop and market products using Columbia University's patented technology.  *Id.* ¶ 13.  Micceri served as VSP's President.  *Id.* ¶ 3; Pl.'s 56.1 ¶ 4.  As discussed *infra*, Micceri was also involved in various capacities with San-Mar and BDS.  Defs.' 56.1 ¶ 32; Pl.'s 56.1 ¶ 24.

San-Mar operates a manufacturing laboratory in Elmsford, New York and manufactured products for BDS.  Defs.' 56.1 ¶¶ 5, 29, 51.  Micceri held various titles at San-Mar, including General Manager, Vice President, and for a period of time, President.  *Id.* ¶ 31; Pl.'s 56.1 ¶ 24.  Defendants, however, contend that despite these titles, Micceri was not an employee but was an independent contractor that operated primarily in a sales role.  Defs.' Counter Rule 56.1

2

Statement ("Defs.' Counter 56.1") ¶ 24; *see also* Pl.'s ¶ 31.  On May 23, 2014, all claims and counterclaims between IBD and San-Mar were voluntarily dismissed.  Pl.'s 56.1 ¶ 10; *see also* Doc. 98.

BDS Solutions, LLC and BDS Technologies, LLC are New York limited liability companies, while BioDefense International, Inc., is a New York corporation.  Pl.'s 56.1 ¶ 6.  At some point in 2009, Micceri entered into a separate consulting agreement with BDS.  Defs.' 56.1 ¶ 32.

BDS' principal members are Jeffrey Berkowitz ("Berkowitz") and David Shucht ("Shucht").  Defs.' 56.1 ¶ 7.  Upon execution of the agreement between IBD and BDS on June 1, 2011, *discussed infra*, Berkowitz and Shucht became directors and officers of IBD.  Pl.'s 56.1 ¶ 43; Decl. of Klein in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Doc. 197) ("Klein Opp'n Decl.") ¶ 7, Ex. D.  Berkowitz also became Vice President of U.S. Sales and Distribution for IBD.  Pl.'s 56.1 ¶ 43; Decl. of Cozean in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Doc. 198) ("Cozean Opp'n Decl.") ¶ 12.  The parties, however, dispute whether Berkowitz became IBD's President following the agreement.  Defs.' Counter 56.1 ¶ 43; Pl.'s Counter Rule 56.1 Statement ("Pl.'s 56.1 Counter") ¶ 12.  Berkowitz held his position as Vice President through March 2013 and served as an IBD director until January 2014.  Pl.'s 56.1 ¶ 43.  Berkowitz is no longer employed by IBD, although the reason for his termination is disputed.  Cozean Opp'n Decl. ¶ 26.

### b.  The Sublicense Agreements

The three BDS entities entered into three separate sublicense patent agreements with VSP (the "Sublicense Agreements") between July 2009 and December 2009.  Pl.'s 56.1 ¶ 11; Defs.' 56.1 ¶ 16; *see also* Decl. of Richard G. Corde in Supp. of Defs.' Mot. for Summ. J. and in

Opp'n to Pl.'s Mot. for Summ. J. (Doc. 190) ("Corde Decl.") Ex. 9 (agreement between VSP and BDS Solutions, LLC dated July 22, 2009), Ex. 10 (agreement between VSP and BDS Technologies, LLC dated August 20, 2009), Ex. 11 (agreement between VSP and BioDefense International, Inc. dated December 31, 2009).[1]  Under the Sublicense Agreements, VSP conveyed the exclusive rights to Columbia University's patented technology for the use and manufacturing of cleansing and skincare products (the "Products") to BDS.  Defs.' 56.1 ¶ 18; Defs.' Counter 56.1 ¶ 12.  The terms and conditions of each Sublicense Agreement are identical except that the field of use and the royalty payment rates are different in each agreement.  Defs.' 56.1 ¶ 16; Sublicense Agreements Schedule 3.1.

Pursuant to the Sublicense Agreements, VSP was required to make certain "know-how" available to BDS:

> VSP shall make available to BDS all Know-How(s) which is/are useful or necessary for BDS to utilize the Patent Rights for the Licensed Products.  Subsequent to the execution of this Agreement, VSP shall afford BDS access to all technical information owned and/or controlled by VSP which has not been previously delivered to BDS.  During the term of this Agreement and any renewal thereof, BDS agrees to disclose and transfer to VSP all improvements to the Patent Rights for VSP's use outside the Field of Use.

*Id.* § 2.4.  Know-how is defined in the Sublicense Agreements as:

> all information, including without limitation trade secrets, whether or not patentable, relating to, used in, or useful in connection with the Patent Rights, or any methods or devices which are claimed to result in and be useful in connection with the Patent Rights, or developed or acquired by VSP during the term of this Agreement.

*Id.* § 1.4.

---

[1] Exhibits 9, 10, and 11 attached the Corde Declaration are cited collectively as the "Sublicense Agreements."

4

BDS also expressed its preference in the Sublicense Agreements to retain "VSP's approved third-party manufacturer, San-Mar Laboratories, Inc. ("Sanmar")" as its manufacturer, but only where certain conditions were met:

> if BDS does not receive acceptable pricing terms and/or manufacturing efforts from Sanmar, then BDS may, at its sole option, pursue a qualified manufacturer from its own source upon more favorable terms/efforts, and VSP will support such efforts . . . . In the event that BDS finds a more acceptable priced manufacturer, BDS will offer Sanmar the opportunity to re-bid on the applicable order(s) and if Sanmar offers pricing within 5% of the competitive pricing, BDS will accept Sanmar's pricing, unless Sanmar's manufacturing efforts are deemed unacceptable.

*Id.* § 2.5.  BDS acknowledged that it "conducted its own review and examination of Sanmar and has made its own decision to retain Sanmar and that such decision has been made without any representations or warranties of Columbia University or VSP." *Id.*  At some point after BDS and VSP entered into the Sublicense Agreements, BDS engaged San-Mar as its manufacturer.  Decl. of Micceri in Supp. of Defs.' Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. ("Micceri Decl.") (Docs. 183, 188) ¶¶ 18, 24; *see also* Pl.'s Opp'n at 5.

Pursuant to the Sublicense Agreements, BDS also "acknowledge[d] that [it] will be fully responsible for the development of all products and for complying with all applicable federal and state laws and regulations regarding the development, manufacturing, distribution, marketing, advertising, promotion and sale of the Licensed Products," Sublicense Agreements § 2.5, and stated it "shall use its best efforts to research, discovery, develop and market Licensed Products for commercial sale and distribution . . . ." *Id.* § 3.6.

In exchange for BDS' use of the patented technology and related know-how, BDS agreed to make royalty payments to VSP, including a guaranteed minimum royalty payment.  Defs.' 56.1 ¶¶ 17, 23; Sublicense Agreements § 3.1 ("In consideration of the grant of License

5

hereunder, BDS agrees to pay to VSP a Royalty as computed on the attached Schedule 3.1");

Sublicense Agreements Schedule 3.1 ("The Royalties shall be as follows:  (i) BDS shall pay to

VSP . . . Five percent (5%) of the Net Sales Price . . . . (ii) BDS shall pay VSP a minimum

monthly non-refundable Royalty as detailed below . . . .").

BDS operated under the Sublicense Agreements from June 2009 to June 2011.  During

these two years, BDS allegedly developed, manufactured, and sold Products utilizing the

patented technology sublicensed from VSP.  *See* Defs.' 56.1 ¶¶ 41, 42, *see also* Corde Decl. Ex.

13 (Berkowitz Dep.) at 28:3-14 ("Q: Did BDS have licensed products for sale within a year of

the execution of this [sublicense] agreement?  A: Yes. . . . I believe we may have had products

within a couple of months.); *id.* at 28:14-22; Corde Decl. Ex. 14 (Shucht Dep.) 16:14-20 ("Q:

And during 2009, did BDS work with VSP and San-Mar to develop products under those

sublicense patent agreements.  A: Yes.  Q: And were you able to get products to market in late

2009?  A:  Yes."); Micceri Decl. ¶¶ 24, 26; *but see* Pl.'s Counter 56.1 ¶ 42 (contending that the

evidence shows that BDS only had a single product available for sale before the end of 2009 and

there is no indication that the Product was manufactured utilizing know-how provided by VSP).

Berkowitz testified that during this time, VSP was not in breach of the Sublicense Agreements

and had provided BDS with the requisite know-how.  Defs.' 56.1 ¶ 41; Berkowitz Dep. at 69:4-6.

Moreover, BDS was not cited for any regulatory compliance issues and Berkowitz testified that

he did not recall any significant quality issues with the Products.[2]  Defs.' 56.1 ¶¶ 48-50;

Berkowitz Dep. 46:14-18.

---

[2] Berkowitz recalled one issue with the raw materials purchased by San-Mar to manufacture the Products that was resolved, but not any issues with the formula.  Defs.' 56.1 ¶ 49.

### c.   The Mates-Fischer Agreement

From 2009 to 2011, BDS made $1.5 million in royalty payments to VSP under the

Sublicense Agreements.  Pl.'s 56.1 ¶ 17.  Initially, BDS' payments were timely, but beginning in

2010, BDS fell behind on payments.  Defs.' 56.1 ¶ 44.  As a result, BDS contacted an individual

named Mates Fischer ("Mates-Fischer") to solicit additional capital.  *Id.* ¶ 52; Berkowitz Dep.

71:7-10; Corde Decl. Ex. 15 (Cozean Dep.) 19:10-12.  BDS and Mates-Fisher purportedly

entered an initial agreement whereby Mates-Fischer, and his associates, agreed to provide one

million dollars to BDS, with $500,000 to be paid to satisfy a portion of BDS' past due royalty

payments, with the expectation that a final transaction between BDS and Mates-Fischer would be

entered.  Defs.' 56.1 ¶ 53; Berkowitz Dep. 71:16-72:12, 73:9-74:6; Micceri Decl. ¶ 31; Corde

Decl. Ex. 6 ¶ 6; *but see* Pl.'s Counter 56.1 ¶ 53 (noting that the agreement attached to the Corde

Declaration lacks certain signatures and is otherwise incomplete).  If no transaction occurred by

March 31, 2011, a recall provision could be triggered that required BDS to refund Mates-

Fischer's capital or, if BDS could not refund the capital, Mates-Fischer would take ownership of

the patented technology under the Sublicense Agreements.  Berkowitz Dep. 73:9-74:6; Corde

Decl. Ex. 6 ¶ 6.  Mates-Fisher ultimately decided not to continue the transaction with BDS and

on May 3, 2011, invoked the thirty-day recall provision, giving BDS until June 2, 2011 to pay

Mates-Fischer or lose its assets.  Defs.' 56.1 ¶ 64; Berkowitz Dep. 74:7-17, 75:1-22.

### d.   Negotiations Between IBD and BDS

Shortly before Mates-Fischer invoked the recall provision, BDS contacted Cozean and

asked if she would be interested in purchasing BDS because without "a significant amount of

money within a month[,]" BDS would cease to exist as a company.  Cozean Dep. 17:4-13, 19:2-

17.  Shortly thereafter, the parties began negotiations.

7

Cozean testified that she identified problems with the Sublicense Agreements, including that she believed that VSP's royalty rate was too high and that the agreements were generally confusing.  Cozean Dep. at 37:12-39:13; Cozean Opp'n Decl. ¶ 3.  Cozean expressed her desire to resolve these issues before entering an agreement with BDS.  Cozean Dep. 39:14-17.  Cozean, on behalf of IBD, Berkowitz on behalf of BDS, and Micceri representing VSP, engaged in negotiations regarding IBD's purchase of BDS' rights under the Sublicense Agreements. Cozean Opp'n Decl. ¶ 3 ("During the month prior to execution of the June 1, 2011 Asset Purchase Agreement between IBD and the . . . BDS entities . . ., I attempted to renegotiate the three sublicense patent agreements between VSP and BDS. . . which agreements were to be assigned to IBD as part of the Asset Purchase Agreement."); Cozean Dep. 40:4-19.

Cozean sent an email to Klein, Berkowitz, and others dated May 27, 2011 attaching a draft of a Binding Term Sheet, which assigned the existing Sublicense Agreements to IBD and contained a provision that the parties would revised certain of the Sublicense Agreements' terms. Defs.' 56.1 ¶ 65; Cozean Opp'n Decl. ¶ 5, Ex. B.  Cozean testified that she discussed the Binding Term Sheet with Micceri, he orally agreed to those terms on behalf of VSP, and Berkowitz represented that he would have Micceri sign the Binding Term Sheet.  Cozean Dep. 44:6-45:18; Cozean Opp'n Decl. ¶ 5.  Instead, Micceri executed a similar but altered documented, titled Memorandum of Understanding.  Cozean Dep. 40:4-19, 46:2-19; Cozean Opp'n Decl. ¶ 6, Ex. C; Corde Decl. Ex. 20.  Cozean asserted that despite Micceri's actions, Berkowitz "insisted" that he could convince Micceri to execute the original Binding Term Sheet.  Cozean Dep. 40:4-13; Cozean Opp'n Decl. ¶ 7.  Instead, Berkowitz, purportedly without Cozean's authorization, executed the altered Memorandum of Understand on behalf of BDS and IBD.  Cozean Opp'n

8

Decl. ¶¶ 7-8.  IBD disputes Berkowitz's authority to execute the Memorandum on its behalf.  *Id.*

¶ 8.

Although, as described, the negotiations between IBD and VSP did not result in a final

agreement between the parties or even an agreement that negotiations to revise the Sublicense

Agreements would continue, Cozean testified that she made a "business decision" to go forward

with the agreement between BDS and IBD, discussed *infra* at Section I.e, because without an

agreement Mates-Fischer would own the sublicenses.  Cozean Dep. 39:22-41:2.

### e.  The Asset Purchase Agreement

On June 1, 2011, IBD entered into an agreement with BDS (the "Asset Purchase

Agreement"), under which IBD obtained the assets conveyed to BDS by the Sublicense

Agreements and assumed certain BDS obligations, including providing the capital to pay off

Mates-Fisher.  Pl.'s 56.1 ¶ 13; Corde Decl. Ex. 16 (Asset Purchase Agreement) §§ 1.1(b),

2.1(iv)(A).  Whether IBD agreed to assume other BDS obligation, specifically whether IBD was

obligated to pay BDS' past due royalty payments, is disputed.  Defs.' Counter 56.1 ¶ 13; Pl.'s

Counter 56.1 ¶ 70.

The Asset Purchase Agreement, in relevant part, states that IBD "wishes to purchase and

BioDefense is willing to sell all of the Assets . . . of BioDefense, and, as part of such purchase

and sale, NewCo[3] is willing to assume certain obligations and liabilities of BioDefense related

to the Assets and otherwise," Asset Purchase Agreement at 1, and "[a]s consideration for the

Assets, NewCo shall . . . (iii) subject to Section 2.1(iv)(B), assume the liabilities under the Sub-

License Agreement with VSP that arise after the Closing Date; and (iv) pay or cause

BioDefense to be paid . . . (B) $250,000 of the next $500,000 in funds raised by NewCo to pay

---

[3] IBD is defined as "NewCo" in the Asset Purchase Agreement.

VSP per the negotiated settlement . . . ." *id.* § 2.1.

### f.   The $48,000 Payment to Micceri

In 2009, before IBD and BDS entered the Asset Purchase Agreement, BDS entered into a separate consulting agreement with Micceri.  Defs.' 56.1 ¶ 32.  Under that agreement, BDS owed Micceri $48,000 in outstanding consultant fees at the time the Asset Purchase Agreement was executed.  *Id.* ¶ 82.  While it is undisputed that Micceri was tendered a check for $48,000 by a company owned by Klein, International Specialty Chemicals & Pharmaceuticals, Inc. ("ISC&P"), on behalf of IBD, Pl.'s Counter 56.1 ¶ 110, Klein Decl. ¶ 7, Ex A, the parties disagree about what the payment was for.

IBD claims that it never assumed BDS' obligation to pay Micceri's past-due consultant fees and the check was tendered in exchange for know-how.  Cozean Dep. 166:12-167:21 (testifying that it was her understanding that the $48,000 tendered to Micceri "had nothing to do with monies owed to VSP from BDS" or for Micceri's personal consultant contract with BDS). Klein prepared an offer letter to Micceri, dated July 27, 2011, stating that Micceri was being provided with a check for $48,000 in exchange for his "best efforts to provide all needed information on formulas, efficiency and stability testing, manufacturing and quality procedures or any other information that would be helpful . . . . [and] to facilitate the manufacturing at San-Mar to provide products for" IBD.  Klein Decl. ¶ 7, Ex. A; *see also* Corde Decl. Ex. 54.  Klein represented that he gave the above-mentioned letter and $48,000 check to Berkowitz with the instruction to obtain Micceri's signature in exchange for the check but not to provide Micceri the check unless he signed the letter.  Klein Decl. ¶ 7; *see also* Decl. of William A. Meyers in Supp. of Pl.'s Opp'n to Defs.' Mot. for Summ. J. (Doc. 196) ("Meyers Opp'n Decl.") Ex. A (Gail Montenegro Dep.) 32:3-24 ("Gary [Klein] repeatedly . . .  told Jeffrey [Berkowitz] to have Carlo

[Micceri] sign the document, piece of paper, and not to release the check until he signed the document.").  Cozean reiterated that Berkowitz was only authorized to release the check to Micceri if he signed the letter.  Cozean Dep. 168:17-169:2.

Defendants contend that the $48,000 check was payment for outstanding consulting fees due to Micceri under BDS' consulting agreement.  Defs.' 56.1 ¶¶ 112, 113; *see also* Berkowitz Dep. 117:13-16 ("Q . . . Was it your understanding that the $48,000 check was going to satisfy Mr. Micceri's consulting claim against BDS?  A: Yes."), 208:11-15.  While Micceri does not dispute that he was presented with the letter, he testified that he refused to sign the letter because he did not accept additional conditions and considered the $48,000 payment for BDS' outstanding obligation under the consultant agreement.  *See* Micceri Decl. ¶ 57 ("Berkowitz approached me with a $48,000 check from Gary Klein's company . . . and a letter suggesting there were terms and conditions regarding the $48,000 check.  Berkowitz advised me that Cozean wanted me to sign the letter in exchange for the draft.  I advised Berkowitz that the $48,000 due and owing to me by BDS was for services already rendered and not contingent upon any conditions. . . . I would only accept the $48,000 check if there were no contingencies . . . Berkowitz called Cozean and after discussing the issue with Cozean, tendered the $48,000 check to me with no representations from me."); Corde Decl. Ex. 12 (Micceri Dep.) at 212:7-20 ("[Berkowitz] said that . . . they [IBD] would like me to sign this letter.  And I told them at that meeting, this is not what this check is for.  I'm not signing this letter" and stating that the check was for "the consulting agreement").

It is undisputed that Micceri did not execute the letter but that Berkowitz gave him the check anyway.  *See* Cozean Dep. 169:3-9.  However, according to Cozean, Berkowitz represented to her that Micceri "had refused to sign the letter today, but he would sign it

11

tomorrow." *Id.* 168:8-10.  When Cozean and Klein confronted Berkowitz for not following their instructions, Berkowitz first explained that Micceri "said that somebody from the company would sign the letter and have it to us tomorrow" but then stated "that he must have misunderstood what [Cozean] said." *Id.* 169:10-24.  Cozean testified that she instructed Berkowitz to withhold the check from Micceri if he refused to sign the letter because she did not believe that Micceri would sign the letter at a later date. *Id.* 168:17-23.

Berkowitz himself has provided conflicting testimony regarding the purpose of the $48,000 check for Micceri.  In a declaration submitted by Berkowitz in support of IBD's earlier motion for a preliminary injunction he represented that "[i]n or around July 2011, I personally brought to Mr. Micceri a check for $48,000 . . . . Mr. Klein, Dr. Cozean, and I decided to give the $48,000 to Mr. Micceri . . . solely for the purpose of facilitating the manufacture of products by San-Mar and having San-Mar and VSP provide the Know-How for the products."  Decl. of Berkowitz in Supp. of Pl.'s Mot. for Preliminary Injunction ("Berkowitz P.I. Decl.") (Doc. 25) ¶ 4.  At Berkowitz's deposition, however, he refuted the above-mentioned declaration and testified that "ultimately Dr. Cozean . . . told me to give the check to Mr. Micceri" and explained that his previous declaration was written from IBD's point of view."  Berkowitz Dep. 207:18-208:25; *see also id.* 117:9-16 ("Q . . . Did Ms. Cozean instruct you to give Mr. Micceri the $48,000 check without him signing anything.  A: Yes.  Q: Okay.  Was it your understanding that the $48,000 check was going to satisfy Mr. Micceri's consulting claim against BDS?  A: Yes.").

### g.  The Parties' Claims for Relief

IBD's Complaint, filed on May 9, 2012, contains eight causes of action against VSP,

San-Mar,[4] and Micceri.  Doc. 1.  They are for:

1) Breach of Contract against VSP and Micceri (*id.* ¶¶ 38-44)

2) Tortious Interference with Prospective Economic Advantage against Micceri (*id.* ¶¶ 45-54 )

3) Tortious Interference with Contract against Micceri (*id.* ¶¶ 55-65)

4) Fraudulent Misrepresentation against Micceri (*id.* ¶¶ 66-70)

5) Negligent Misrepresentation against Micceri (*id.* ¶¶ 71-74)

6) Fraud in the Inducement regarding the Sublicense Agreements against Micceri (*id.* ¶¶ 75-79)

7) Fraud in the Inducement regarding the Asset Purchase Agreement against Micceri (*id.* ¶¶ 80-84)

8) Breach of the Implied Covenant of Good Faith and Fair Dealing against VSP and Micceri (*id.* ¶¶ 85-92).

On December 20, 2012, Defendants VSP and Micceri assert ten counterclaims against

IBD.  Doc. 36.  They include:

1) Breach of Contract against IBD and Cozean (*id.* ¶¶ 97-101)

2) Unjust Enrichment against IBD and Cozean (*id.* ¶¶ 102-106)

3) Unfair Competition and False Advertising under the Lanham Act 15 U.S.C. § 1125(a) against IBD and Cozean (*id.* ¶¶ 107-117)

4) Dilution of Trademark under the Lanham Act, 15 U.S.C. § 1125(c), and N.Y. General Business Law § 360-1 against IBD (*id.* ¶¶ 118-122)

5) Unfair Business Practices under N.Y. General Business Law § 349 against IBD (*id.* ¶¶ 123-126)

6) Unfair Competition against IBD (*id.* ¶¶ 127-134)

---

[4] IBD voluntarily dismissed San-Mar from the initial action on May 22, 2014.  Docs. 96, 98.

7) False and Fraudulent Registration of a Patent under 15 U.S.C. § 1120 against IBD (*id.* ¶¶ 135-138)

8) Conspiracy to Defraud against IBD (*id.* ¶¶ 139-145)

9) Breach of Confidentiality Clause in the Sublicense Agreements and the Asset Purchase Agreement against IBD and Cozean (*id.* ¶¶ 146-150)

10) Reasonable Attorneys' Fees, Costs, and Disbursement against IBD (*id.* ¶¶ 151-152).

On January 3, 2013, Defendants filed a Third Party Complaint against BDS alleging the same ten causes of action, listed *supra*, in Defendants' counterclaims against IBD.  Doc. 37 (¶¶ 37-93).

On March 11, 2013, BDS filed its Answer to the Third Party Complaint and asserted six counterclaims against VSP, Micceri, and San-Mar.  Doc. 60.  The counterclaims are for:

1) Breach of Contract against VSP, Micceri, and San-Mar (*id.* ¶¶ 142-151)

2) Fraud in the Inducement against VSP and Micceri (*id.* ¶¶ 152-156)

3) Tortious Interference with Prospective Economic Advantage against Micceri and San-Mar (*id.* ¶¶ 157-165)

4) Tortious Interference with Contract against Micceri (*id.* ¶¶ 166-174)

5) Breach of Quasi-Contract and Unjust Enrichment against San-Mar (*id.* ¶¶ 175-178)

6) Breach of Implied Covenant of Good Faith and Fair Dealing against VSP, Micceri, and San-Mar (*id.* ¶¶ 179-186).

### h. Cross-Motions for Summary Judgment

At a conference held on March 19, 2015, the Court granted IBD's request to file a motion for summary judgement and granted Defendants' request to file a cross-motion for summary judgment.  IBD timely moved to dismiss all of Defendants' counterclaims but sought no affirmative relief pursuant to their own claims.  Docs. 173, 174.  Defendants opposed IBD's motion only with regards to their counterclaims for breach of contract, unjust enrichment, and

reasonable attorneys' fees, costs and disbursement. *See* Corde Decl. ¶¶ 3-6 (stating that Defendants' are discontinuing the balance of their counterclaims).[5]

Defendants timely cross-moved requesting that this Court (1) dismiss IBD's Complaint, (2) dismiss BDS' counterclaims against Defendants, and (3) grant summary judgment for Defendants' breach of contract, unjust enrichment, and reasonable attorneys' fees, costs, and disbursement counterclaims against IBD and third party claims against BDS.[6]   Docs. 181, 185. As stated, Defendants do not seek summary judgment on the other seven counterclaims and third party claims.  Corde Decl. ¶¶ 3-6.

## II.  Legal Standard

To prevail on summary judgment, the movant must show that "there is no genuine dispute as to any material fact."  FED. R. CIV. PRO. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'"  *Id.*  "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual

---

[5] Accordingly, the Court finds Defendants expressly abandoned these counterclaims and grants IBD's motion for summary judgment to dismiss these claims.  *See Cowan v. City of Mount Vernon*, No. 12 Civ. 6881 (KMK), 2015 WL 1400088, at *15 (S.D.N.Y. March 27, 2015) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.").

[6] BDS did not seek leave and did not move in response to Defendants' motion for summary judgment on BDS' third party counterclaims against Defendants, likely because BDS was no longer represented by counsel.

BDS' counsel, Denlea & Carton, LLP, moved to withdraw as counsel on March 10, 2015, before the other parties moved for summary judgment.  Doc. 165.  The Court granted Denlea & Carton LLP's request to withdraw by teleconference on April 29, 2015.  *See* Docs. 192, 200.  As of the date of this Opinion, no replacement counsel for BDS has appeared before this Court.

dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).  On a summary

judgment motion, the district court "may not make credibility determinations or weigh the

evidence . . . . 'Credibility determinations, the weighing of evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge.'"  *Id.* at 545–46

(quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

"When confronted with cross-motions for summary judgment, the Court analyzes each

motion separately, 'in each case construing the evidence in the light most favorable to the non-

moving party.'"  *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1

(S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir.

2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach

party's motion must be examined on its own merits, and in each case all reasonable inferences

must be drawn against the party whose motion is under consideration.") (citation omitted).  The

Court is not required to resolve the case on summary judgment merely because all parties move

for summary judgment.  *Morales*, 249 F.3d at 121.

## III.  Discussion

### a.  Defendants' Breach of Contract Counterclaim Against IBD and Third Party Claim Against BDS

Under New York law, the "essential elements of a breach of contract cause of action are

the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's

breach of his or her contractual obligations, and damages resulting from the breach."  *LaRoss*

*Partners, LLC v. Contact 911 Inc.*, No. 11 Civ. 1980 (ADS) (ARL), 2015 WL 2452616, at *6

(E.D.N.Y. May 21, 2015) (internal quotations and citation omitted).  A party "will not be able to

prevail on its breach of contract claim unless it . . . proves, by a preponderance of the evidence,

that it performed its own obligations under the contract."  *Id.*  However, "a party's performance

under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186-87 (2d Cir. 2007) (citing *Hadden v. Consol. Edison Co. of N.Y.*, 312 N.E.2d 445, 449, 34 N.Y.2d 88, 96 (N.Y. 1974)).

"[A] breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the contract." *LaRoss Partners*, 2015 WL 2452616, at *9-10. "Several factors bear on whether a party has substantially performed under a contract, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance." *Id.* (quoting *CSC Recovery Corp. v. Daido Steel Co., Ltd.*, No. 94 Civ. 9214 (LAP), 2000 WL 134578, at *6 (S.D.N.Y. Feb. 4, 2000)). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch & Co. Inc.*, 500 F.3d at 187.

IBD moves for summary judgment on Defendants' breach of contract counterclaim, which alleges that IBD and Cozean breached the Sublicense Agreements by failing to make the requisite royalty payments, Answer with Counterclaims ¶¶ 97-101, on the basis that IBD's failure to perform was excused by Defendants' breach by failing to provide the know-how required under the agreements. Pl.'s Mem. at 2. Defendants contend that any breach by BDS or IBD is not excused because VSP fully complied with its obligations under the Sublicense Agreements, including providing know-how. Defs.' Mem. at 6-8.

17

Defendants cross-move on its breach of contract claims against IBD and BDS based on both parties' failure to make the requisite royalty payments under the Sublicense Agreements. Defs.' Mem. at 4; Doc. 181.   IBD opposes Defendants' cross-motion asserting that questions of fact exists as to whether IBD assumed BDS' obligation to pay royalties pursuant to the Sublicense Agreements and whether VSP was the alter ego of Micceri.  Pl.'s Opp'n at 1-2.

IBD does not move this Court for summary judgment on its own breach of contract claim against Defendants; it instead asks the Court to find as a matter of law that Defendants cannot prevail on their breach of contract counterclaim against IBD.  However, in order to make this determination, as well as to determine whether to grant Defendants' cross-motion on the same counterclaim, the Court must analyze whether Defendants materially breached the Sublicense Agreements such that they would not be able to recover under their own breach of contract claim and IBD's and BDS' breaches would be excused.

### i. Defendants' Performance Pursuant to the Sublicense Agreements

The crux of the dispute regarding VSP's performance under the Sublicense Agreements is whether VSP made available the requisite know-how contemplated under the agreements. While both parties assert that the Sublicense Agreements are unambiguous, both parties put forth different interpretations of this purportedly unambiguous language.

IBD asserts that based on the broad obligations and the broad definition of know-how in the Sublicense Agreements, VSP was obligated to "make available" know-how related not only to the patented technology, but also information regarding the manufacturing and development of the technology.  *See* Sublicense Agreements § 2.4 ("VSP shall make available . . . *all Know-How*(s) which is/are useful or necessary for BDS to utilize the Patent Rights for the Licensed Products.") (emphasis added); § 1.1 (defining "know-how" as "*all* information,

18

including *without limit . . .* whether or not patentable, . . . used in, or useful in connection with the

Patent Rights, *or any other methods or devices* which are claimed to be . . . useful in connection

with the Patent Rights.") (emphasis added).  According to IBD, VSP failed to meet this

obligation by refusing to provide the know-how requested by IBD and required to develop,

manufacture, and sell Products.  *See* Pl.'s 56.1 ¶¶ 19, 21, 22 (explaining that "various

quality control documents, product formulation data, test results, raw material

specifications, and other information" was not provided to IBD despite requests).

Conversely, Defendants assert that VSP was only obligated to "make available"

know-how related to technical information owned or controlled by VSP based on the

language of the Sublicense Agreements and the fact that BDS, not VSP, was responsible for

the Products' development, manufacturing, marketing, and sale.  Sublicense Agreements § 2.4

("Subsequent to the execution of this Agreement, VSP shall afford BDS access to *all*

*technical information owned and/or controlled by VSP* which has not been previously delivered to

BDS . . . .") (emphasis added); *id.* § 2.5 ("BDS further acknowledges that BDS will be fully

responsible for the development of all products and for complying with all applicable federal

and state laws and regulations regarding the development, manufacturing, distribution,

marketing, advertising, promotion and sale of the Licensed Products.").  According to Defendants,

at the time the Sublicense Agreements were entered into, the "know-how" contemplated by the

agreements was "formulas created by Columbia University" and other information possessed by

VSP, "prototypes of formulations, articles from Columbia University, the patents, information

packets that VSP had put together which included Columbia's testing results, a power point

spreadsheet which again listed testing as well as comparison work published by Columbia."

Defs.' 56.1 ¶¶ 25, 26, 37.  Moreover, Berkowitz testified that at the time the Asset Purchase

19

Agreement was executed, BDS did not consider VSP to be in breach of its agreements, nor did he believe that VSP had breached its obligation to provide know-how under the Sublicense Agreements.  Pl.'s 56.1 ¶ 44; Berkowitz Dep. 110:18-111:15 ("Q:  As of that date [when the Asset Purchase Agreement was executed], had VSP provided all of the technical know-how necessary for BDS to create product?  A:  Yes . . . Q: At that point in time, had BDS declared . . . VSP in breach of its agreement?  A: No."); 230:8-15 ("Q: . . . As of June 2011, at the time of the signing of the [A]sset [P]urchase [A]greement . . . what was your understanding of what know-how comprised as that term is used in the sublicense patent agreement?  A: Know-how comprised of the formulas . . .").

Based on the plain language of the Sublicense Agreements, Defendants' interpretation of its obligation regarding know-how is untenable.[7]  Section 2.4 of the Sublicense Agreements suggests that two separate obligations are imposed on VSP:  (1) first "to make available to BDS *all* Know-How which is[] useful or necessary for BDS to utilize the Patent Rights," and (2) "[s]ubsequent to the execution of this Agreement," to "afford BDS access to *all technical information owned and/or controlled* by VSP" not already provided.  Sublicense Agreements § 2.4 (emphasis added).  To follow Defendants' interpretation of know-how would render the difference between "all" know-how and "technical information owned and/or controlled by VSP" superfluous.  *Id.*; *see also Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (noting that "[u]nder New York law, an interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible")

_____

[7] Berkowitz's understanding of know-how does not alter the Court's interpretation where the plain language is clear. *See MyPlayCity, Inc. v. Conduit Ltd.*, No. 10 Civ. 1615 (CM), 2012 WL 1107648, at *10 (S.D.N.Y. Mar. 30, 2012) ("Mere assertion by one that contract language means something to him, where it is otherwise clear, unequivocal and understandable when read in connection with the whole contract, is not in and of itself enough to raise a triable issue of fact."), *adhered to on reconsideration*, No. 10 Civ. 1615 (CM), 2012 WL 2929392 (S.D.N.Y. July 18, 2012).

(internal quotation marks omitted).  Defendants' interpretation also ignores the fact that neither

the definition of know-how, nor the obligation to make know-how available is discussed with

reference to specific categories, except with regards to the know-how available to BDS *after* the

Sublicense Agreement is executed.  *See* Sublicense Agreements § 2.4.

The Court's rejection of Defendants' know-how interpretation, however, does not mean

that Defendants' breached the Sublicense Agreements as a matter of law.  Nor does it mean that

IBD's or BDS' obligations under the Sublicense Agreements were excused.  Summary Judgment

in favor of either IBD or Defendants on Defendants' breach of contract counterclaim is

precluded based on the existence of issues of material fact including (1) whether VSP breached

the agreement where BDS was able to produce the product based on the know-how provided,

and relatedly, (2) if VSP did breach, whether such a breach was material such that IBD's breach

would be excused or, (3) in the alternative, even assuming Defendants' interpretation of its

know-how obligation was correct, whether VSP complied with its obligations.

### 1.   Whether VSP Materially Breached the Sublicense Agreements

The critical issue, aptly identified by IBD, is not whether some know-how was provided,

but is whether the know-how provided was sufficient to satisfy VSP's obligations under the

Sublicense Agreements.  *See* Pl.'s Mem. at 5.  There is no dispute that VSP provided some

know-how to BDS and IBD, specifically technical know-how in its ownership and control

consisting of the formulas from Columbia University, any updates thereto, and documents

pertaining to Columbia University's testing of the technology.  Defs.' Mem. at 9, 11, 13.  There

is also evidence that, by the end of 2009, BDS was manufacturing and selling products—the

explicit benefit afforded to BDS under the Sublicense Agreements—created from the know-how

provided by VSP.  *See* Berkowitz Dep. at 28:3-22; Shucht Dep. 16:14-20; Micceri Decl. ¶¶ 24, 26.[8]

     IBD, however, claims that, notwithstanding whether BDS was able to manufacture and sell Products, the know-how provided by VSP was insufficient to allow IBD to manufacture products that were fit to be sold or complied with applicable FDA regulations.  Pl.'s Mem. at 1. For example, when IBD provided another manufacturing laboratory, Benchmark Cosmetic Laboratories, Inc. ("Benchmark"), with "the master formula files for two products manufactured by San-Mar" and attempted to replicate those products, the products created were unfit for sale and were not compliant with various government regulations.  Pl.'s 56.1 ¶ 32.  According to IBD's expert, Susan Goldsberry, the Chief Executive Officer and President of Benchmark, Benchmark prepared the formulations according to the master files and subjected them to certain testing based on FDA requirements, which both products failed.  Pl.'s 56.1 ¶¶ 32-34.  Another IBD expert, Dr. Morris Waxler, Ph.D, opined that based on the information VSP produced during discovery as the know-how it turned over to BDS and IBD, IBD could not have manufactured, packaged, or distributed the Products without violating FDA regulations.  Decl. of Meyers in Supp. of Pl.'s Mot. for Summ. J. (Doc. 178) ("Meyers Decl.") Ex. F; Pl.'s 56.1 ¶¶ 37, 38, 41.  Accordingly, IBD argues that its performance should be excused by VSP's material breach because IBD could not legally sell the products and thus, it received no benefit under the

---

[8] While there is evidence that IBD placed a purchase order based on one of the technologies licensed in the Sublicense Agreements, it is unclear whether that order was ever produced, and if not, why it was not produced. Micceri Decl. ¶ 76 ("On December 22, 2011 IBD placed a purchase order with C-Care LLC [manufacturer] for 3,000 gallons of bulk formula VME-178-06 which is one of Columbia's formulas turned over to BDS as part of the exchange of 'know-how' by VSP."); Cozean Dep. at 183:1-13, 184:9-10 (Q: . . . did IBD put in a purchase order to C-Care [manufacturer]?  A:  it looks like they did . . . [for] lotion.  Q:  Did they produce it for you?  A: they did not. . . . Q: And do you know why?  A: I do not.").

agreements.[9]  It is not clear as a matter of law, however, that no benefit was received by BDS or

IBD under the Sublicense Agreements such that IBD's purported breach should be excused.

Even accepting as true for the purposes of IBD's summary judgment motion that based

on the know-how provided by VSP, the products could not be manufactured in compliance with

FDA and other government regulations, this does not establish, as a matter of law, that VSP

materially breached the Sublicense Agreements excusing IBD's performance.  As conceded by

IBD, the Sublicense Agreements place the onus of complying with government regulations on

BDS.  *See* Pl.'s R. Mem. at 8; Sublicense Agreements § 2.5 ("BDS further acknowledges that

BDS will be fully responsible for the development of all products and for complying with all

applicable federal and state laws and regulations regarding the development, manufacturing,

distribution, marketing, advertising, promotion and sale of the Licensed Products."); *see also id.* §

10.2 ("BDS agrees to comply with all applicable federal, state and local laws and

regulations regarding the development, testing, manufacture, marketing, promotion and sale of

the Licensed Products.").  While IBD attempts to counteract this obligation by pointing out that

the Sublicense Agreements also require VSP to make available all know-how "'useful or

necessary' for IBD to utilize the technology," this obligation does not amount to a guarantee that

the know-how alone will result in a compliant product.  Moreover, IBD's contention that it

retained no benefit from the Asset Purchase Agreement and the Sublicense Agreements is belied

by its requests to renew the Sublicense Agreements on April 23, 2012 and May 11, 2012.  Corde

---

[9] Defendants contend that IBD should be estopped from arguing that VSP breached the Sublicense Agreements because IBD purportedly admitted in the Asset Purchase Agreement that no default occurred under the Sublicense Agreements.  Defs.' Opp'n at 9, 14 (citing Asset Purchase Agreement § 4.8 ("Other than the $500,000 in license fees owed to VSP . . . there is no default under the Sublicense Agreements or the License Agreements by and between VSP and Columbia.")); *see also* Defs.' R. Mem. at 8-9.  However, Section 4 of the Asset Purchase Agreement contains the "Representations, Warranties and Covenants of BioDefense" made to IBD by BDS.

Decl. Ex. 55.  IBD's motion to dismiss Defendants' breach of contract counterclaim is thus,
DENIED.

### 2.   Whether VSP Made Available All Technical Know-How in its Ownership or Control

Even had the Court adopted Defendants' understanding of know-how, there are issues of
material fact as to whether VSP complied with this obligation.

There is no dispute that, even under Defendants' interpretation, updated formulas created
by Columbia University would be considered "know-how."  *See, e.g.*, Micceri Dep. 102:14-16
("Q: Did these newer formulas constitute part of what you consider the know-how?  A: Yeah.");
Defs.' Counter 56.1 ¶ 18 ("All formulas and know-how with regard to the technology were
provided to BDS . . . . As additional know-how was created by Columbia, it was provided to
BDS."); *see also* Defs.' Opp'n at 15.  Micceri turned over updated formulas, along with other
information, to Bruce Minksy ("Minksy"), who Defendants identify as BDS' and IBD's attorney,
to be held in escrow until IBD paid royalties purportedly owed to VSP under the Sublicense
Agreements.  Defs.' Counter 56.1 ¶ 18; Defs.' 56.1 ¶ 91; Micceri Dep. 98:3-103:9.  Defendants
contend that because the updated formulas were being held by IBD's attorney, it was available to
IBD.  However, issues of material fact preclude finding that turning such information over to
Minsky satisfied VSP's obligation to make the know-how available.  *First*, there is a factual
dispute over whether Minsky was even IBD's attorney.  *See* Decl. of Cozean in Supp. of Pl.'s
Mot. for Summ. J. (Doc. 177) ("Cozean Decl.") ¶ 9 ("Minsky, who was BDS' attorney");
Cozean Opp'n Decl. ¶ 13 ("Bruce Minsky is not, and has never been, an attorney for IBD [and] .
. . is not, and has never been, on the IBD Board of Directors."); *but see* Micceri Dep. 98:3-103:9;
Decl. of Corde in Supp. of Defs.' R. Mem. ("Corde R. Decl.") ¶ 2, Ex. 58 (letter from Minsky to
San-Mar dated September 1, 2011 regarding the manufacturing dispute between San-Mar and

24

IBD and stating that "if [San-Mar] elect[s] not to comply with one of these requests, I will have no choice but to pursue legal remedies for the damages being incurred upon Innovative BioDefense."). *Second*, the information held in escrow by Minksy was never released, and thus, was arguably not "available" to IBD. *See* Micceri Dep. 102:17-103:5 ("Q: Did you even given him [Minsky] the okay to release them?  A: I was never paid.  Q: Okay.  Did you ever give him the okay to release them?  A: No."); *see also* Cozean Opp'n Decl. ¶ 13; Cozean Dep. at 82:11-15 ("Q:  Did there come a point in time that you received the formulas that . . . were to have been held in escrow?  A:  Not to the best of my knowledge.  I have never seen what was in escrow . . . ."). Accordingly, these factual issues—whether Minsky was IBD's attorney, and even if he was, whether information held in escrow that was never released may be considered available as required under the Sublicense Agreements—preclude summary judgment.

IBD also provided evidence that VSP not only failed to make know-how available, but that Micceri, through his positions at VSP and/or San-Mar, purportedly hindered IBD's access to know-how owned and controlled by San-Mar:

- Email dated August 30, 2010 from Micceri to Shucht and Berkowitz directing them that "All correspondence for Dr[.] Modak is to come through me unless I say otherwise.  I've gotten in trouble for that in the past.  Thank you, Carlo."  Meyers Opp'n Decl. ¶ 4, Ex. B.

- Email dated October 26, 2010 from Shucht to Micceri stating "Hi Carlo.  Did the alcohol [product] come in yet? Out of stock. Thanks, David."  Micceri replied "Did the money come in yet? Out of money!"  Cozean Opp'n Decl. ¶ 16, Ex. G.

- Email dated August 10, 2011 from Berkowitz to Cozean stating "Carlo just called and stated that he was not planning to give us documents until he received additional funds and he agreed that you should cancel the pending meeting with Dial."  Cozean Opp'n Decl. ¶ 17, Ex. H.

- Email dated February 27, 2012 from Elsebeth Olsen, from ISC&P, to Cozean stating that they "were advised by Jeffrey [Berkowitz], that in order to receive Patent and other information, we needed to pay Carlo [Micceri] $48,000, which we did.  As much of this information was never received, it is my opinion, that this debt should be reimbursed by

BDS."  Cozean responded "Jeffrey [Berkowitz] thought that if we paid Carlo [Micceri] this money, Carlo would produce information and produce product.  In fact, SanMar signed an agreement that day to give us all the quality documents.  They never lived up to that agreement."  Meyers Opp'n Decl. ¶ 5, Ex. C.

- Email dated April 25, 2012 from Shucht to Cozean with the subject line "sanmar" stating that "I was told [b]y Kristy [Faulhaber] in person that there would be no more work on Zytrel products until Carlo gets paid."  Cozean Opp'n Decl. ¶ 19, Ex. J.[10]

This evidence supports IBD's contention that, even assuming Defendants' understanding of know-how—which is based in part on IBD's ability to obtain know-how related to manufacturing and development from San-Mar and BDS—that Micceri individually or acting on behalf of VSP hindered IBD's access to such know-how in violation of the Sublicense Agreements.  Based on this evidence, Defendants have not, as a matter of law, established their compliance with the Sublicense Agreements.   Accordingly, Defendants' motion for summary judgment on its breach of contract counterclaim is DENIED.

### ii.  IBD's Alleged Breach of the Sublicense Agreements

It is undisputed that IBD did not pay royalties to VSP after entering into the Asset Purchase Agreement with BDS.  Pl.'s Mem. at 1-2 ("IBD did not make royalty payments to

---

[10] Defendants argue that the Court cannot take into account much of the above referenced evidence because it represents inadmissible hearsay, "out-of-court statements offered to prove the truth of the matter asserted."  *See* Defs.' R. Mem. at 10; FED. R. EVID. 801(c)).  However, "[h]earsay evidence is admissible at the summary judgment stage if the contents would otherwise be admissible at trial."  *Auz v. Century Carpet, Inc.*, No. 12 Civ. 417 (LGS), 2014 WL 199511, at *1 (S.D.N.Y. Jan. 17, 2014).  Here, it is likely that much of the evidence identified by IBD—specifically evidence regarding what Micceri purportedly said to other individuals—will be admissible at trial as party admissions.  *See* FED. R. EVID. 801(d)(2)(A) (deeming admissible statements offered against an opposing party that were "made by the party in an individual or representative capacity"); *see also Rodriguez v. Modern Handling Equip. of NJ, Inc.*, 604 F. Supp. 2d 612, 622 (S.D.N.Y. 2009) ("Since plaintiff is a party to the lawsuit, however, his statements in the OSHA report, if they are legible, may come in as a non-hearsay party admission under 801(d)(2)(B).").

Defendants also assert that IBD may not rely on the settlement agreement between San-Mar and IBD because, *inter alia*, IBD never produced the agreement to Defendants, despite requests, during discovery.  Defs.' R. Mem. at 8-9; Corde R. Decl. Ex. 60; Cozean Opp'n Decl. Ex. F.  Even without relying on the settlement agreement, material issues of fact exist regarding whether Micceri improperly hindered IBD's access to know-how from San-Mar that preclude Defendants' motion for summary judgment on their breach of contract counterclaim.  Accordingly, the Court finds it unnecessary at this point to decide the settlement agreement's admissibility.

VSP—other than the $1.5 million (at minimum) IBD paid to VSP through BDS.  There is no

dispute on this issue.").  It is, however, contested whether IBD assumed BDS' obligation,

through the Asset Purchase Agreement, to pay BDS' past-due royalties payments.

Defendants contend that IBD agreed to assume all of BDS' obligations and liabilities,

including past due royalty payments under the Sublicense Agreements.  Defs.' Mem. at 16 (citing

Asset Purchase Agreement at 1, § 1.1(b)); Berkowitz Dep. 95:9-13 (answering "yes" to counsel's

question "was it your understanding that at the time of the closing, one of the forms of funding

IBD was going to provide would have been BDS' ability to repay VSP that outstanding debt.").

However, nothing in the Asset Purchase Agreement supports Defendants' position.  In fact, the

Asset Purchase Agreement establishes that IBD agreed to assume only *some* of BDS'

obligations.  *See* Asset Purchase Agreement at 1 ("Newco wishes to purchase and Biodefense is

willing to sell *all* of the 'Assets' . . . of Biodefense, and as part of such purchase and sale, Newco

is willing to assume *certain* obligations and liabilities of Biodefense related to the Assets and

otherwise.") (emphasis added); *id.* § 2.1(iii) ("Newco shall. . . subject to Section 2.l(iv)(B),

assume the liabilities under the Sub-License Agreement with VSP that arise after the Closing

Date"); *id.* § 2.4 ("Newco expressly disclaims and does not and shall not assume or in any way

be liable or responsible for, any liabilities or obligations whatsoever of BioDefense . . .

including . . . (iii) any debts, liabilities, or obligations relating to or arising from any

contract or agreement made or entered into by BioDefense, or binding on BioDefense with

any entity or individual . . . whether arising prior to, on, or after the Closing Date ("Contract

Liabilities") unless expressly assumed as Assumed Debts on Schedule 2.3.").[11]  Moreover,

Section 1.1(b) merely states that the Sublicense Agreements were part of the assets to be

---

[11] No Schedule 2.3 is attached to the Asset Purchase Agreement submitted to the Court.

purchased by IBD, not that IBD agreed to assume all obligations of BDS under those Sublicense Agreements.  *Id.* § 1.1(b).

Notwithstanding the fact that IBD did not agree to assume all of BDS' obligations under the Sublicense Agreements, IBD did agree to "pay or cause BioDefense to be paid . . . $250,000 of the next $500,000 in funds raised by NewCo to pay VSP per the negotiated settlement."  *Id.* § 2.1(iv)(B).  IBD asserts that any obligation it had to pay $250,000 of BDS' debt to VSP was premised on the existence of a negotiated settlement, which never occurred and thus, IBD was not required to pay the $250,000.  Pl.'s Opp'n at 15; Cozean Decl. ¶ 10.  According to IBD, the "negotiated settlement referenced in Paragraph 2.1(iv)(B) of the Asset Purchase Agreement between IBD and BDS" is the same negotiated settlement referenced in the Memorandum of Understanding between VSP, BDS, and IBD dated May 30, 2011 stating that "VSP and IBD agree to negotiate in good faith, within two weeks of the Closing Date, one agreement, which will supersede the [Sublicense Agreements] . . ."  Cozean Decl. ¶ 10, Ex. D; Pl.'s Counter 56.1 ¶ 70; Corde Decl. Ex. 20.  However, IBD asserts that the May 30, 2011 Memorandum is unenforceable.  To the extent that the Memorandum is not enforceable, IBD has identified no obligation or understanding that VSP, BDS or IBD must engage in negotiated settlement as a prerequisite to IBD's payment of $250,000.[12]

Moreover, Cozean testified that she made the business decision to execute the Asset

---

[12] IBD claims that the Memorandum is unenforceable for two reasons.  *First*, while Micceri orally agreed to an earlier version of the Memorandum, Cozean Opp'n Decl. ¶ 5, Ex. B, he later altered the terms of the Memorandum (as reflected in *id.* Exs. C, D) and signed that version.  *Id.* ¶¶ 6, 9.  *Second*, Berkowitz executed the altered Memorandum signed by Micceri on behalf of BDS and IBD, which IBD contends Berkowitz had no authority to do because he did not become an officer or director of IBD until the Asset Purchase Agreement was executed the next day on June 1, 2011.  *See id.* ¶¶ 7-9; Klein Opp'n Decl. Ex. D; *but see* Micceri Decl. ¶ 41.  Moreover, if the Memorandum is enforceable, certain terms, specifically that "IBD agrees to accept current contracts 'as is' and is responsible for all liabilities and obligations under those contracts," Cozean Opp'n Decl. Exs. C, D, expressly conflicts with IBD's obligations under the Asset Purchase Agreement.  Neither party, however, has addressed which document would be controlling in such a situation.

Purchase Agreement with BDS although she was aware that Micceri had not agreed to negotiate

a settlement regarding the underlying Sublicense Agreements because without such an

agreement BDS would lose its assets, including the technology IBD sought to license.  Cozean

Dep. 39:23-41:2.  Whether this testimony supports Defendants' contention that IBD's obligation

was not premised on the settlement negotiation, which Cozean knew Micceri had not yet agreed

to engage in, or supports IBD's contention that that is exactly why it included the requirement

that IBD only be obligated to pay the $250,000 if a settlement between VSP, IBD, and BDS was

reached, is a question of fact that reasonable jurors may disagree on.   Accordingly, the above

factual issues preclude Defendants' motion for summary judgment of its breach of contract claim

against IBD and thus, is DENIED.[13]

### b.  Defendants' Unjust Enrichment Counterclaim Against IBD

Defendants' move for summary judgment on their unjust enrichment counterclaim

against IBD on the basis that IBD continues to develop, process, market, sell (and profit from)

products utilizing the know-how, trade secrets, and patent technologies provided by VSP

pursuant to the Sublicense Agreements without paying the royalties owed to VSP under these

agreements.  Defs.' Mem. at 18-19, 21; Defs.' Answer with Counterclaims ¶¶ 102-106.

Accordingly, Defendants contend that they are entitled to "continuing royalty payments" as

required under in the Sublicense Agreements.  Defs.' Mem. at 18-19, 22.

"The basic elements of an unjust enrichment claim in New York require proof that (1)

defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate

against permitting defendant to retain what plaintiff is seeking to recover."  *Briarpatch Ltd., L.P*

---

[13] Defendants contend that VSP is due payment as a third party beneficiary of the Asset Purchase Agreement.  Defs.'
Mem. at 17.  Because the Court finds that questions of fact exist regarding whether IBD obligated itself to pay BDS'
past due royalty payments, the Court does not address this argument.

*v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  However, "New York courts do not allow unjust-enrichment claims when there is a valid contract between the parties governing the subject matter at issue."  *Guy Carpenter & Co., LLC v. Lockton Re, LP*, No. 10 Civ. 4932 (CM) (KNF), 2010 WL 4449048, at *4 (S.D.N.Y. Nov. 4, 2010).

Defendants assert that the Sublicense Agreements were never "formally" renewed by VSP, despite IBD's requests to do so, because of IBD's breach.  Corde Decl. Exs. 55 (IBD's request for renewal of the Sublicense Agreements dated April 23, 2012 and May 11, 2012), 56 (informing Cozean by letter dated July 16, 2012, that her "letters of 4/23/212 and 5/11/12 are being treated as a nullity."); *see also* Defs.' Mem. at 18-19.  However, Defendants now seek to hold Plaintiffs to these same agreements that they purportedly refused to renew.  Accordingly, Defendants' counterclaim for unjust enrichment fails as a matter of law because VSP's right to royalty payments is governed by the Sublicense Agreements.  Accordingly, Defendants' motion for summary judgment on its unjust enrichment counterclaim is DENIED and IBD's motion to dismiss Defendants' unjust enrichment counterclaim is GRANTED.

### c.  Micceri's Counterclaims Against IBD

IBD asserts that all individual claims asserted by Micceri should be dismissed because the claims arise from either the Sublicense Agreements, which Micceri was not a party to, or the technology licensed from Columbia University by VSP, not Micceri.  *See* Pl.'s Mem. at 4; Pl.'s 56.1 ¶ 5; Micceri Dep. 163:17-25.  According to IBD, Micceri is not a real party in interest pursuant to Rule 17(a) of the Federal Rules of Civil Procedure and likewise lacks standing. *Monahan v. Pena*, No. 08 Civ. 2258 (JFB) (ARL), 2009 WL 2579085, at *3 (E.D.N.Y. Aug. 18, 2009) (dismissing the plaintiff's breach of contract action for lack of standing where the action was brought in the plaintiff's own name but he was "plainly not a party to that contractual

agreement, and not an intended third-party beneficiary" and "as an officer, has no standing to sue to vindicate the rights of his corporation." (citing *Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.*, 627 F. Supp. 1202, 1212 (S.D.N.Y. 1986), *aff'd,* 814 F.2d 90 (2d Cir. 1987); *Wein v. Fensterstock*, No. 04 Civ. 4640 (RO), 2004 WL 2423684, at *1 (S.D.N.Y. Oct. 28, 2004)).  At Micceri's deposition, he himself stated that he understood that VSP was suing IBD, not that he was suing IBD in his individual capacity.  Pl.'s 56.1 ¶ 5; Micceri Dep. at 163:12-16.  Defendants do not address this argument.  Accordingly, IBD's motion for summary judgment to dismiss all claims asserted by Micceri individually is GRANTED.

### d.   IBD's Claims Against Micceri

Defendants move to dismiss IBD's claims against Micceri individually because IBD has not presented sufficient evidence that VSP is the alter ego of Micceri to warrant disregarding the corporate form.  Defs.' Mem. at 22-25.  However, Defendants' only address five of IBD's claims against Micceri—breach of contract, tortious interference with prospective economic advantage, tortious interference with contract, fraudulent misrepresentation, and negligent misrepresentation—and do not address the claims regarding fraud in the inducement or breach of the implied covenant of good faith and fair dealing.  The Court does not address the claims not addressed by Defendants.

### i.   IBD's Breach of Contract Claim Against Micceri Under the Alter Ego Theory

Generally, individuals acting in their capacity as officers and directors of a corporation may not be held personally liable for actions undertaken by the corporation.  However, "New York will disregard the corporate form when the corporation has been so dominated by an individual or another corporation . . . and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own[,] and this domination was used to

commit a fraud or other wrong that causes the plaintiff's loss." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2005) (internal quotation marks omitted); *KCG Americas LLC v. Brazilmed, LLC*, No. 15 Civ. 4600 (AT), 2016 WL 900396, at *4 (S.D.N.Y. Feb. 26, 2016) ("A defendant officer will be subject to liability for a corporate wrong in two circumstances: First, where the officer acted in bad faith when inducing the corporate breach of contract, or committed independent torts or predatory acts directed at another, and second, where the officer has so dominated the corporation and disregarded its separate identity such that the corporation can be called the [officer's] alter ego") (internal quotation marks omitted).  "Whether a wrongdoer is a defendant's alter ego is a fact specific matter that turns on such factors as the failure to adhere to corporate formalities, undercapitalization, intermingling of funds, overlap in ownership, staff and directorship, common use of office space, the degree of discretion shown by the wrongdoer, whether the dealings between the entities are at arms length, and whether the corporations are treated as independent profit centers." *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 292.  "[T]he Second Circuit has noted that the question of piercing the corporate veil is a fact-intensive issue that generally must be submitted to the jury." *Carte Blanche PTE., Ltd. v. Diners Club Int'l, Inc.*, 758 F. Supp. 908, 914 (S.D.N.Y. 1991) (citing *American Protein Corp. v. AB Volvo*, 844 F.2d 56, 59 (2d Cir. 1988)); *see also Fulgini Orilio & F.LLI S.p.A v. Lettieri*, No. 05 Civ. 3718 (SMG), 2007 WL 1834750, at *3 (E.D.N.Y. June 26, 2007) ("[t]he question of whether one corporation is an alter ego of another is a fact-specific inquiry . . . [that is] often not amenable to resolution on a motion for summary judgment.").

IBD does not present affirmative evidence of Micceri's domination over VSP.  However, according to VSP, all articles of incorporation, bylaws, stock ledgers, shareholder lists, and minutes from shareholder and director meetings were destroyed and are not available.  Meyers

Opp'n Decl. Ex. E (responding to IBD's request for "stock ledges, membership ledgers, shareholder lists, and any other documents that summarize the ownership structure of VSP, or otherwise identify shareholders, stockholders, members, managers . . ." and "minutes from any meetings of the officers, directors, shareholders. . . ." by explaining that "[d]uring Superstorm Sandy the building in which the[se] documents were maintained was flooded. . . [and] the records were damaged beyond repair"); Meyer Decl. Ex. A (Micceri's Dep. Errata Sheet stating that "much of the hardcopy records of VSP were destroyed in Hurricane Standy in the Fall of 2012."). Accordingly, the only evidence regarding VSP's corporate form and Micceri's purported domination thereof, is from Micceri himself.

While Micceri testified at his deposition that VSP has bylaws, issued stock certificates, has bank accounts in VSP's name, has issued corporate credit cards to Micceri and his brother, has an accountant to maintain its books and records, and holds Board of Director meetings, consisting of Micceri and his brother, the only two directors, where minutes are taken, *see* Micceri Dep. 228:18-25, 229:1-2, 229:21-22, 230:1-17, he could not recall various general elements of VSP's corporate structure, including:  1) who the shareholders of VSP were at the time of its incorporation, (2) if the shareholders changed over time, (3) whether VSP has always had only two officers, Micceri and his brother, (4) if anyone else besides himself and his brother had been VSP officers, (5) if anyone besides himself had made capital contributions to VSP, and if so, who they were, and (6) whether he ever borrowed money from VSP. *Id.* 227:19-231:3. Accordingly, the question of whether VSP was dominated by Micceri is a question of credibility for the jury. *See Coach, Inc. v. Younes Corp., Inc.*, No. 11 Civ. 11559, 2012 WL 4757925, at *4 (E.D. Mich. Oct. 5, 2012) (denying the defendant's request for summary judgment dismissing the plaintiff's alter ego claims where the only evidence presented regarding whether corporate

formalities were applied or whether the corporation was used to commit fraud was based solely on the individual defendant's affidavit because "the credibility of his testimony is a genuine issue of a material fact that a jury should decide."); *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Material questions of fact regarding the second prong of the alter ego analysis, whether any purported domination was used to commit a fraud or other wrongdoing that causes the plaintiff's loss, also exist. *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 291-92; *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 299 (E.D.N.Y. 2014) ("This prong does not require evidence of fraud, rather a veil-piercing claimant can prevail without proving fraud if the claimant can identify some non-fraudulent 'wrong' attributable to the defendant's complete domination of a subsidiary entity.").  As discussed *supra* at Section III.a.i.2, IBD has also put forth evidence that Micceri used his domination of VSP to interfering with VSP's contractual obligation to make available the requisite know-how to IBD, including allegedly preventing know-how from being released to IBD.  Defendants' motion to dismiss IBD's breach of contract claim against Micceri is therefore DENIED.

### ii.  IBD's Tortious Interference with Contract and Tortious Interference with Prospective Economic Advantage Claims Against Micceri

In order "[t]o state a contract-interference claim under New York law, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff."  *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 124-25 (2d Cir. 2008).   To state a claim for tortious interference with prospective economic advantage "under New York law, four conditions must be met:  (1) the plaintiff had business relations with a third

party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Id.* at 132. "The wrongful means requirement makes alleging and proving a tortious interference claim with business relations more demanding than proving a tortious interference with contract claim. . . . While a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means, such acts are not essential to find wrongful means." *Id.* (internal quotation marks omitted). IBD contends that Micceri tortiously interfered with its prospective business advantage and the Sublicense Agreements by withholding know-how required under the agreements and necessary to manufacture and sell the licensed technology. Compl. ¶¶ 45-65.

Defendants moved to dismiss these claims on two bases. *First*, that the obligation to provide know-how was derived from the Sublicense Agreements and Micceri cannot be held personally liable on claims that arise from a contract he was not a party to. Defs.' Mem. at 24. However, IBD's claims against Micceri for interference are not based on an alter ego theory of liability but are based on his own alleged actions purportedly interfering with the Sublicense Agreements and IBD's economic advantages derived therefrom. Compl. ¶¶ 45-65; *see also Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 701 (S.D.N.Y. 2015) ("[a] corporate employee or officer who himself participates in a tort, even if it is in the course of his duties, may be held individually responsible.") (internal quotation marks omitted). *Second*, Defendants contend that "IBD has not established a duty on the part of Micceri, individually that was allegedly breached," nor does IBD "identify a contract that didn't take place" or "an economic advantage that they did not get because of 'tortious interference.'" Defs.' R. Mem. at 8-9. Defendants are incorrect. As discussed *supra* at Section III.a.i.2, IBD provides evidence of

multiple actions by Micceri that may be interpreted to have inhibited VSP, Columbia University, and San-Mar from providing requisite know-how to IBD that effected IBD's ability to manufacture and sell Products.  Accordingly, Defendants' motion to dismiss IBD's tortious interference with contract and tortious interference with prospective economic advantage claims against Micceri is DENIED.

### iii.   IBD's Fraudulent Misrepresentation And Negligent Misrepresentation Claims Against Micceri

"[I]n a claim for fraudulent misrepresentation, a plaintiff must allege a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1108, 16 N.Y.3d 173, 178 (N.Y. 2011) (quoting *Lama Holding Co. v. Smith Barney,* 668 N.E.2d 1370, 1373,88 N.Y.2d 413, 421 (N.Y. 1996)).  "[A] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information" *Id.* at 1109, at 180) (internal quotation marks omitted).

IBD's claims for fraudulent and negligent misrepresentation are based on IBD's payment to Micceri of $48,000.  Compl. ¶¶ 66-74.  The dispute arises in connection with whether Micceri was paid to satisfy BDS' past debt under the consultant agreement, as contended by Defendants, or in exchange for additional consideration from Micceri to provide IBD with know-how and facilitate manufacturing by San-Mar, as argued by IBD.  However, the vast majority of misrepresentations or omissions identified by IBD in connection with the $48,000, were made by Berkowitz, not Micceri.  IBD contends that both Klein and Cozean directed Berkowitz to tender

Micceri the $48,000 check *only if* he signed the letter.  Berkowitz, however, tendered the check without securing Micceri's signature in contravention of IBD's purported instructions and his own purported statements to Klein.  *See* Montenegro Dep. 32:12-33:4.  The one misrepresentation that may be attributable to Micceri is Berkowitz's purported explanation to Cozean that he gave Micceri the check even though he did not sign the letter because Micceri "had said that somebody from the company would sign the letter and have it to us tomorrow."[14] Cozean Dep. 169:10-24.

Whether Micceri made this statement and whether Berkowitz relied on it in tendering the check to Micceri is tenuous because Berkowitz provided an alternate explanation, that "he must have misunderstood what [Cozean] said," to explain why he turned over the check without obtaining Micceri's signature.  *Id.*  Throughout this action, Berkowitz has also provided conflicting testimony concerning the circumstances of turning over the check.  *See* Berkowitz P.I. Decl. ¶ 4 ("[i]n or around July 2011, I personally brought to Mr. Micceri a check for $48,000 . . . . Mr. Klein, Dr. Cozean, and I decided to give the $48,000 to Mr. Micceri . . . solely for the purpose of facilitating the manufacture of products by San-Mar and having San-Mar and VSP provide the Know-How for the products."); *but see* Berkowitz Dep. 117:9-16 ("Q . . . Did Ms. Cozean instruct you to give Mr. Micceri the $48,000 check without him signing anything.  A: Yes.  Q: . . .Was it your understanding that the $48,000 check was going to satisfy Mr. Micceri's consulting claim against BDS?  A: Yes."); 207:18-210:5 (explaining that his previous declaration was written from IBD's point of view).  Moreover, Cozean testified that she did not believe Berkowitz was being candid with her when he called from his meeting with Micceri and said that

---

[14] While this statement in its current form is double hearsay, one section of the hearsay statement is admissible as a party admission and because Berkowitz will likely testify at trial, it is likely that his testimony could be presented in an admissible form.

Micceri "had refused to sign the letter today, but he would sign it tomorrow" and that was why she had told him to "take the check back and return it if Mr. Micceri ever did sign the document or hold onto the check." Cozean Dep. 168:8-168:23. Despite this conflicting testimony, a reasonable jury could credit Cozean and/or Berkowitz. Accordingly, Defendants' motion for summary judgement as to IBD's fraudulent and negligent misrepresentation claims against Micceri is DENIED.

## IV. Conclusion

For the reasons set forth above, Plaintiff's motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's motion is GRANTED as to Defendants' unjust enrichment counterclaim (Count 2), all counterclaims abandoned by Defendants (Counts 3-9), and all claims brought individually by Micceri, but DENIED as to Defendants' breach of contract and reasonable attorneys' fees, costs, and disbursement counterclaims (Counts 1 and 10). Defendants' cross-motion for summary judgment is DENIED in its entirety. The parties are directed to appear before the Court for a status conference on May 11, 2016 at 11:00 am. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 173, 181.

It is SO ORDERED.

Dated: March 31, 2016
     New York, New York

_____
Edgardo Ramos, U.S.D.J.

38