UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
INNOVATIVE BIODEFENSE, INC.,

                Plaintiff,

           - against -

VSP TECHNOLOGIES, INC., SAN-MAR
LABORATORIES, INC., and CARLO MICCERI,

                Defendants.
-----------------------------------------------------------X
VSP TECHNOLOGIES, INC., and
CARLO MICCERI,

                Third Party Plaintiffs,

           - against -

BDS SOLUTIONS, LLC, BDS
TECHNOLOGIES, LLC, and BIODEFENSE
INTERNATIONAL, INC.,

                Third Party Defendants.
-----------------------------------------------------------X

**OPINION AND ORDER**

12 Civ. 3710 (ER)

Ramos, D.J.

       This action stems from a series of agreements governing the sublicensing of patented technology used to manufacture antimicrobial products, including hand sanitizer. Plaintiff Innovative Biodefense, Inc. ("IBD" or "Plaintiff") brought this action against VSP Technologies, Inc. ("VSP") and Carlo Micceri ("Micceri," and collectively "Defendants") alleging, *inter alia*, breach of the agreements to sublicense the patented technology.[1] Defendants brought counterclaims against Plaintiff and a third party complaint against third party defendants BDS Solutions, LLC, BDS Technologies, LLC, and BioDefense International, Inc. (collectively

---
[1] Plaintiff also named San-Mar Laboratories, Inc. as a defendant, but voluntarily dismissed it from the action on May 22, 2014.

"BDS") also for, *inter alia*, breach of the same sublicensing agreements. Plaintiff and Defendants previously cross-moved for summary judgment in March and April 2015, respectively, and the Court issued an opinion and order on March 31, 2016 (the "March 31, 2016 Order"), granting in part and denying in part Plaintiff's motion, and denying Defendants' motion in its entirety.

Pending before the Court is Plaintiff's motion for partial summary judgment of its claims for (1) breach of contract against VSP regarding the International Sublicense Agreement; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) fraud in the inducement of the International Sublicense Agreement; and (5) fraud in the inducement of the Asset Purchase Agreement, the latter four claims of which are all against Micceri. For the reasons discussed below, Plaintiff's motion is DENIED in its entirety.

**I. Background**

The Court presumes familiarity with its March 31, 2016 Order, which details the facts and procedural history of this case, Doc. 206, and discusses here only those facts necessary for its disposition of the instant motion.

**A. The Parties**

IBD is a California corporation that develops, manufactures, and sells antimicrobial products, including skincare and cleansing products. Doc. 206 at 2. Colette Cozean ("Cozean") is IBD's President and Chief Executive Officer. *Id*. Gary Klein ("Klein") is IBD's Vice-Chair, Chief Operating Officer, and Vice President of International Sales. *Id*.

VSP is a New York corporation that licenses and markets various technologies, but does not itself manufacture or sell any product. *Id*. VSP was incorporated to secure a master license from Columbia University for its patented antimicrobial formulas. *Id*. Columbia University

granted VSP exclusive rights to develop and market products using Columbia University's patented technology (the "Columbia Technology"). *Id*. Micceri served as VSP's President. *Id*. Micceri was also involved in various capacities with San-Mar and BDS. *Id*.

BDS Solutions, LLC and BDS Technologies, LLC are New York limited liability companies, while BioDefense International, Inc., is a New York corporation. *Id* at 3. BDS' principal members are Jeffrey Berkowitz ("Berkowitz") and David Shucht ("Shucht"). *Id*.

As discussed *infra* and in the Court's March 31, 2016 Order, in 2009, VSP sublicensed the exclusive rights to the Columbia Technology to BDS in exchange for royalty payments. *Id*. at 3–6. Also in 2009, Micceri entered into a separate consulting agreement with BDS. *Id*. at 3. On June 1, 2011—after BDS had fallen behind on royalty payments and found itself in a precarious financial situation—Plaintiff agreed to purchase BDS' assets, including the exclusive rights to the Columbia Technology, and assumed certain BDS obligations (the "Asset Purchase Agreement"). *Id*. at 7–10. Berkowitz and Shucht became directors and officers of Plaintiff after the asset purchase. *Id*. at 3. In particular, Berkowitz became Vice President of U.S. Sales and Distribution. *Id*. Berkowitz held this position through March 2013 and served as director until January 2014. *Id*.

### B. The International Sublicense Agreement

The three BDS entities entered into three separate sublicense patent agreements with VSP between July 2009 and December 2009 (the "Sublicense Agreements"). *Id*. at 3. Under the Sublicense Agreements, VSP conveyed the exclusive rights to the Columbia Technology for the use and manufacturing of cleansing and skincare products (the "Products") to BDS. *Id*. at 4. One of those agreements was the Sublicense Patent Agreement between VSP and third party

3

defendant BioDefense International, Inc.,[2] dated December 31, 2009 (the "International Sublicense Agreement" or "Agreement"). Decl. of Gary Klein in Supp. of Pl.'s Mot. For Partial Summ. J. (Doc. 228) ("Klein Decl."), Ex. C. Under the Agreement, VSP granted BDS an exclusive sublicense to make, have made, and sell the products. International Sublicense Agreement, Section 2.1. In exchange, BDS agreed to pay royalties that allowed use of the license in seven regions (European Union, Eastern Europe, Central America, Australia, Asia, Middle East, and Africa). *Id*., Schedules 3.1, 3.3. While BDS made some fee and royalty payments to VSP, Plaintiff has not made any royalty payments to VSP since acquiring BDS' assets in June 2011. Pl.'s 56.1 ¶ 40–41, Defendants' Response to Plaintiff's Rule 56.1 Statement ("Defs.' Resp. to Pl.'s 56.1") ¶ 40–41; Pl.'s Mem. at 11–12.

Pursuant to the Agreement, VSP and Columbia University were responsible for prosecuting all U.S. patent applications and foreign patent applications in jurisdictions they chose, included within the Patent Rights,[3] and for taking action at their discretion to perfect or effect title to the Patent Rights. International Sublicense Agreement, Section 7.1

### C. The Asset Purchase Agreement

The Court's March 31, 2016 Order summarizes the failed negotiations between Plaintiff and VSP prior to the Asset Purchase Agreement between Plaintiff and third party defendant BDS.

---

[2] For ease of reference, the Court will refer to BioDefense International, Inc. as BDS.

[3] Section 1.1 defines "Patent Rights" as "(i) all claims of patent applications and issued patents maturing and that are part of the Columbia Patents in the 'Field of Use' and for the 'Institutional Marketplace' (*as hereinafter defined*), and any and all divisions, continuations, continuations in part, and reissues thereof, or 'Know-How' (*as hereinafter defined*); (ii) all claims of such patent applications and issued patents which may hereafter be filed or issued, or of which VSP may hereinafter become owner, or to which VSP may hereafter acquire rights during the term of this Agreement, and which read on or relate to the Columbia Patents and are in the Field of Use for the Institutional Marketplace or read on or relate to the Know-How; (iii) any inventions, conceived or reduced to practice before the date of this Agreement or during the term of this Agreement, and thereafter made the subject of a patent application relevant to the Patent Rights that are then licensed by VSP; and (iv) any and all reissues or extensions of any of the foregoing." Section 1.3 defines "Institutional Market Place" as "World-wide, exclusive of North America."

Plaintiff contends that during those negotiations, Micceri made certain representations that induced Plaintiff to sign the Asset Purchase Agreement. According to Plaintiff, Micceri represented that the company Dial/Henkel was "days away from executing a $4,000,000 deal for the sale of BDS' foaming soap in the United States, Canada, and Europe." Pl's Mem. at 15; Pl.'s 56.1 ¶ 50; Cozean Decl. ¶ 5. In reality, the prospective contract with Dial/Henkel was only worth approximately $100,000 in sales, and was never finalized. Pl.'s 56.1 ¶ 53; Defs.' Resp. to Pl.'s 56.1 ¶ 53. Micceri denies having made any representations to Plaintiff regarding the existence of an agreement with Dial/Henkel. Def's Counter 56.1 ¶ 42; Micceri Decl. ¶¶ 21, 45 ("To the extent [Cozean's Declaration] implies that I represented to her that Dial would enter into a contract for sale worth $4,000,000 with BDS, I categorically deny the assertion. I made no representations to Cozean in this regard."). Plaintiff asserts that in a further effort to induce it to sign the Asset Purchase Agreement, Micceri represented to Cozean that he would sign a memorandum of understanding containing reduced royalty rates. Pl.'s Mem. at 16; Pl.'s 56.1 ¶ 30.

   D.  **Representations Regarding Foreign Patent Coverage**

Before Plaintiff and third party defendant BDS entered into the Asset Purchase Agreement, Plaintiff and Micceri—in his capacity as president of VSP—discussed the existence of foreign patent coverage for the Columbia Technology. Pl.'s 56.1 ¶ 47–48; Defs.' 56.1 ¶ 37. According to Plaintiff, Micceri represented that international patents existed in every region of the world, in as many as 19 countries, but in reality the only foreign patents existed in South Korea and Japan. Pl.'s 56.1 ¶ 47–48, 51. Plaintiff asserts that Micceri's false representations

5

regarding foreign patent coverage further induced Plaintiff to sign the Asset Purchase Agreement. Pl.'s Mem. at 8–9.

Plaintiff also contends that when VSP originally negotiated the sublicensing of the Columbia technology with BDS, Micceri made similar misrepresentations about foreign patent coverage that induced BDS to enter into the Sublicense Agreements. Pl.'s 56.1 ¶ 43; Nix. Decl., Exhibit C (Schucht Dep.) 69:3-10 (in response to counsel's question regarding what Micceri told him about the scope of international patents, Schucht responded "that they were covered internationally" and that it was his understanding that this meant "worldwide coverage."). Micceri denies having made any representations to BDS concerning foreign patent coverage, Defs.' Mem. at 11. Micceri also asserts that while he did tell Cozean that VSP had *some* international patent coverage for the Columbia technology, "he never specified where precisely such coverage existed" nor did he "specify how many countries were covered by international patents." Defs.' Counter 56.1 ¶ 37.

According to Plaintiff, Micceri also misrepresented his ability to provide updated information regarding the status of foreign patents before the close of the Asset Purchase Agreement. Pl.'s 56.1 ¶ 49; Pl.'s Mem. at 3. Cozean asserts—and Micceri does not deny—that he asked Micceri to provide a comprehensive list and status of all patents licensed to BDS, and Micceri represented that he did not have the information. Pl.'s 56.1 ¶ 49. According to Plaintiff, Micceri's representation was false because Columbia regularly provided him with a full status report on the patents. *Id.*; Cozean Decl. ¶ 7. Micceri, on the other hand, denies that Columbia regularly provided him or VSP with the status of the Columbia patents. Defs.' Resp. to Pl.'s 56.1 ¶ 42; Micceri Decl. ¶ 39.

6

**II.     Legal Standard**

To prevail on summary judgment, the movant must show that "there is no genuine dispute as to any material fact." Fed. R. Civ. Pro. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). "A 'material' fact is one that might 'affect the outcome of the litigation under the governing law.'" *Id.* "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). On a summary judgment motion, the district court "may not make credibility determinations or weigh the evidence . . . . 'Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* at 545–46 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

**III.    Discussion**

**A. <u>Plaintiff's Breach of Contract Claim Against VSP</u>**

Under New York law, the "essential elements of a breach of contract cause of action are the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." *LaRoss Partners, LLC v. Contact 911 Inc.*, No. 11 Civ. 1980 (ADS) (ARL), 2015 WL 2452616, at *6 (E.D.N.Y. May 21, 2015) (internal quotations and citation omitted). A party "will not be able to prevail on its breach of contract claim unless it . . . proves, by a preponderance of the evidence, that it performed its own obligations under the contract." *Id.* However, "a party's performance

7

under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) (citing *Hadden v. Consolidated Edison Co. of N.Y.*, 312 N.E.2d 445, 449, 34 N.Y.2d 88, 96 (N.Y. 1974)).

"[A] breach is not material, and the aggrieved party is not excused from performance of its obligations, if the breaching party has substantially performed his end of the contract." *LaRoss Partners*, 2015 WL 2452616, at *9-10. "Several factors bear on whether a party has substantially performed under a contract, including the ratio of the performance already rendered to that unperformed, the quantitative character of the default, the degree to which the purpose behind the contract has been frustrated, the willfulness of the default, and the extent to which the aggrieved party has already received the substantial benefit of the performance." *Id* at 9. (quoting *CSC Recovery Corp. v. Daido Steel Co., Ltd.*, No. 94 Civ. 9214 (LAP), 2000 WL 134578, at *6 (S.D.N.Y. Feb. 4, 2000)). "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch & Co. Inc.*, 500 F.3d at 186.

Plaintiff moves for partial summary judgment of its breach of contract claim against VSP, arguing that VSP breached the Agreement "because it failed to provide worldwide foreign patent protections as promised yet continued to collect royalties for patents in foreign regions that did not exist." Pl.'s Mem. at 10. Plaintiff contends that VSP's failure to provide worldwide patent coverage is a material breach of the Agreement and excused payment of royalties by it and BDS. *Id.* at 11. VSP, on the other hand, argues that at the time BDS and VSP entered into the Agreement, BDS representatives "were interested only in obtaining the exclusive rights to market and sell products internationally" and "were not concerned with patent rights." Defs.'

8

Mem. at 8. Furthermore, according to VSP, the Agreement does not specify which countries are required to be covered by patents, and VSP and Columbia "had total discretion to choose where to prosecute patents throughout the world." *Id*. Accordingly, VSP contends that Plaintiff is not entitled to summary judgment because (1) it has failed to establish a breach of the Agreement and (2) it breached the Agreement itself by failing to pay royalties to VSP and its performance has not been excused.

### i. VSP's Alleged Breach of the Agreement

This portion of the dispute arises from the parties' conflicting interpretations of VSP's contractual obligations regarding foreign patent coverage. Plaintiff contends that pursuant to the Agreement, it agreed to pay monthly royalties in exchange for licensing patents in seven regions of the world, which were identified in Schedule 3.1 of the Agreement.[4] Pl.'s Mem. 12. According to Plaintiff, VSP breached by failing to confer patent coverage in five of those regions.[5] *Id*. Conversely, VSP contends that the Agreement does not specify which countries are required to be covered by patents, and, in any event, VSP and Columbia had complete discretion to choose where to prosecute patents throughout the world. Defs.' Mem. at 8. According to VSP, the Agreement only granted BDS "the exclusive rights to sell the Columbia Technology internationally *regardless* of the existence of international patents." Defs.' Counter 56.1 ¶ 6 (emphasis added). Because VSP provided BDS with world-wide rights to develop, market, and

---

[4] The seven regions listed in Schedule 3.1 are the European Union, Eastern Europe, Central America, Australia, Asia, the Middle East, and Africa.

[5] According to Plaintiff, at the time that BDS and VSP entered into the Agreement, foreign patents existed only in Japan, South Korea, and the United Kingdom. *See* Pl.'s 56.1 ¶ 45. Plaintiff contends that shortly after the Agreement went into effect, VSP abandoned the Australian patent, and thus patent coverage was reduced to Japan, South Korea, and the United Kingdom. *Id*. Plaintiff further contends that by the time it executed the Asset Purchase Agreement, the United Kingdom patent had also been abandoned and international patents existed only in Japan and South Korea. *Id*. ¶ 51. VSP disputes this assertion, and asserts that as of May 10, 2012—prior to Plaintiff bringing this action—patents existed throughout Europe, Australia, Brazil, Canada, China, India, Japan, Israel, Korea, New Zealand, Russia, Hong Kong, Thailand, Malaysia, and Mexico. Defs.' Resp. to Pl.'s 56.1 ¶ 51.

9

sell products using the Columbia Technology, VSP argues that it upheld its end of the bargain. Defs.' Mem. at 8.

A plain reading of the Agreement does not support Plaintiff's interpretation of VSP's obligations regarding foreign patent coverage. Nothing in the Agreement indicates that VSP had an obligation to maintain patent coverage in any specific countries or in each of the seven regions listed in Schedules 3.1 and 3.3. To the contrary, Section 7.1 of the Agreement provides that VSP and Columbia had complete discretion to choose where to prosecute patents throughout the world. International Sublicense Agreement, Section 7.1 ("VSP and/or Master Licensor shall be responsible for prosecuting . . . foreign patent applications in such foreign jurisdictions as VSP and/or Master Licensor chooses, included within the Patent Rights, and for taking action at its discretion as shall perfect or effect its title to the Patent Rights.").

The absence of any language suggesting that VSP had an obligation to maintain or pursue patent coverage in specific countries or regions supports VSP's assertion that BDS, and later Plaintiff, was sublicensing the exclusive rights to market and sell products using the Columbia Technology internationally, regardless of where patents existed. Micceri testified that "BDS wanted exclusive rights to sell product internationally, regardless of whether there was patent coverage. The international sublicense patent agreement granted BDS exclusive territories, regardless of the existence of patents." Micceri Dep. 113:14 (errata). According to Micceri, therefore, BDS agreed to pay royalties in exchange for exclusivity in the regions listed in Schedule 3.1 of the Agreement, not in exchange for patent coverage in those regions. Plaintiff has not presented any testimonial or documentary evidence contradicting Micceri's declaration or otherwise indicating that BDS had a different understanding of VSP's obligation regarding foreign patent coverage. Because a reasonable jury could find that VSP granted BDS the

exclusive rights to market and sell the Columbia Technology internationally regardless of foreign patent coverage, Plaintiff's motion for summary judgment of its breach of contract claim is precluded by factual issues and thus, is DENIED.

## B. Plaintiff's Claims Against Micceri

Plaintiff moves for partial summary judgment of its claims of (1) fraudulent misrepresentation, (2) fraud in the inducement of the International Sublicense Agreement, (3) fraud in the inducement of the Asset Purchase Agreement, and (4) negligent misrepresentation against Micceri.

To prevail on its claims for fraudulent misrepresentation and fraudulent inducement under New York law, a plaintiff must prove five elements by clear and convincing evidence: (1) a material misrepresentation or omission of fact, (2) made by the defendant with knowledge of its falsity (3) and an intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff. *Hindsight Solutions, LLC v. Citigroup Inc.*, 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014). In addition, "[f]raudulent inducement involves a misrepresentation of present fact, not of future intent, collateral to a contract and used to induce the defrauded party to sign the contract." *Bruce v. Martin*, No. 87 Civ. 7737(RWS), 1993 WL 148904, at *5 (S.D.N.Y. Apr.30, 1993) (emphasis added) (internal quotation marks and citation omitted). "The clear and convincing evidence standard demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal or contradictory because fraud will not be assumed on doubtful evidence or circumstances of mere suspicion." *Hindsight Solutions*, 53 F. Supp. 3d at 772 (internal quotation marks and citations omitted).

"[A] claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 180 (2011) (internal quotation marks and citations omitted).

Plaintiff's fraud and negligent misrepresentation claims against Micceri are based on four misrepresentations allegedly made by Micceri regarding (1) the extent and scope of international patent coverage, (2) Micceri's inability to provide updated documentation regarding the status of international patents, (3) the size and status of the Dial/Henkel deal, and (4) an agreement to reduce royalty rates. Pl.'s Mem. at 14–16; Defs.' Mem. at 10. Micceri contends that summary judgment is precluded because "the record is replete with genuine disputed facts regarding whether Micceri even made the representations alleged." Defs.' Mem. at 10. Because Plaintiff's fraud and negligent misrepresentation claims against Micceri revolve around the same statements, each set of alleged misrepresentations is discussed in turn for purposes of Plaintiff's four claims against Micceri.

> *i. Representations regarding the extent and scope of international patent coverage*

As discussed above, according to Plaintiff, "in the negotiations between BDS and VSP, Micceri represented to BDS that the international patent technologies contemplated under the International Sublicense Agreement were covered by valid patents worldwide." Pl.'s 56.1 ¶ 43; Nix. Decl., Exhibit C (Schucht Dep.) 69:3-10. Plaintiff also claims that Micceri made similar misrepresentations regarding the extent of foreign patent coverage to it during negotiations related to the Asset Purchase Agreement. Pl.'s Mem. at 15. According to Plaintiff, during a meeting in late 2010, Micceri stated that "VSP had patents in over a dozen countries in each

region of the world." Pl.'s 56.1 ¶ 47; Klein Decl. ¶ 6; Cozean Decl. ¶ 3. Plaintiff asserts that around April or May 2011, Micceri represented that VSP had foreign patent coverage in approximately 19 countries. Pl.'s 56.1 ¶ 48; Cozean Decl. ¶ 4; Klein Decl. ¶ 6. However, Plaintiff relies only on the testimony of Cozean and Klein as the basis for these purported misrepresentations. It does not proffer any undisputed fact or document to establish that Micceri made the statements.

Micceri, on the other hand, contends that he made no representations or warranties to BDS concerning the coverage of the foreign patents. Defs.' Mem. at 11. According to Micceri, at the time VSP and BDS were negotiating the Sublicense Agreements, BDS was only interested in obtaining exclusive rights to the Columbia Technology, and were not concerned with specific patent coverage rights. Defs.' Mem. at 11; Defs.' Resp. to Pl.'s 56.1 ¶ 43; Micceri Decl. ¶ 6 ("In reality, I made no representations and warranties concerning the state of the North American or international patents to BDS at the time we entered into the Sublicense Patent Agreements. . . . [BDS was] not concerned with patent rights, which Columbia University had a vested interest in preserving and replacing, as necessary.").

Regarding his alleged representations to Plaintiff during the negotiation of the Asset Purchase Agreement, Micceri asserts that while he did tell Cozean that VSP had *some* international patent coverage for the Columbia technology, "he never specified where precisely such coverage existed" nor did he "specify how many countries were covered by international patents." Defs.' Counter 56.1 ¶ 37; Micceri Decl. ¶ 8, 10, 22-23, 34-35, 37, 42, 44, 46, 52, 57.

Whether Micceri represented to Plaintiff and BDS that VSP had *worldwide* patent coverage over the Columbia technology is an issue of material fact for purposes of summary judgment of Plaintiff's fraud and negligence claims against Micceri. Because Micceri denies

13

making any representations to BDS regarding foreign patent coverage and disputes the substance of his representations to Plaintiff, factual issues preclude summary judgment and this portion of Plaintiff's motion is DENIED.

> ### ii. *Representations regarding Micceri's lack of updated documentation on the status of international patents*

Plaintiff claims that Micceri falsely represented that he was unable to provide an updated list of foreign patents within the time Plaintiff had to close on the Asset Purchase Agreement. Pl.'s Mem. at 15. Plaintiff contends that it asked Micceri for a comprehensive list of all foreign patents and Micceri stated that he did not have the information but would get it from Columbia. *Id*. According to Plaintiff, this was false because "Columbia regularly provided Micceri with a current list of the status of all Columbia Patents and, therefore, Micceri had access to this information at all times during the negotiations." *Id.*; Pl.'s 56.1 ¶ 42, 49; Cozean Decl. ¶ 7 ("As further part of the due diligence process, I asked Jeffrey Sears from Columbia about the status of the Columbia patents. Sears claimed that Columbia regularly provided a status report on the Columbia patents to Micceri, but that IBD would have to get the report from Micceri.").

Micceri does not deny telling Plaintiff that he was unable to provide an updated list of all foreign patents before the close of the Asset Purchase Agreement. However, he does deny Plaintiff's assertion that Columbia regularly provided him or VSP with the status of the Columbia patents. Defs.' Resp. to Pl.'s 56.1 ¶ 42; Micceri Decl. ¶ 39 ("To the extent [Cozean's declaration] states that Columbia 'regularly provided' me or VSP with the status of the Columbia patents, or that I could provide Cozean or IBD with that information, I deny the assertion."). While Micceri admits that Columbia would provide him with a "chart of the patents covering Columbia Technology," he asserts that "[t]his chart was not kept regularly up to date." Micceri Decl. ¶ 25.

This portion of Plaintiff's motion is based on its claim that Micceri's representations about his inability to provide an updated list of patents were false because he was regularly updated by Columbia. Thus, the regularity with which Columbia provided Micceri with status reports is a material issue. Because Micceri disputes receiving regular updates from Columbia, and because Plaintiff presents no undisputed fact or document that he did receive the information regularly, summary judgment of this portion of Plaintiff's claims against Micceri is precluded and Plaintiff's motion is DENIED.

### iii. Representations regarding the size and status of the Dial/Henkel deal

Micceri directly disputes Plaintiff's claim that Micceri, acting on behalf of BDS as part of his consulting role for the company, represented to Plaintiff that "Dial/Henkel were days away from executing a $4,000,000 deal for the sale of BDS' foaming soap in the United States, Canada, and Europe." Pl's Mem. at 15; Pl.'s 56.1 ¶ 50; Cozean Decl. ¶ 5. While Micceri does not dispute that the proposed contract with Dial/Henkel was only with $100,000 in sales, *see* Defs.' Resp. to Pl.'s 56.1 ¶ 53, he categorically denies having made any representations to Plaintiff regarding the existence of an agreement with Dial/Henkel or its size. Def's Counter 56.1 ¶ 42; Micceri Decl. ¶¶ 21, 45 ("To the extent [Cozean's Declaration] implies that I represented to her that Dial would enter into a contract for sale worth $4,000,000 with BDS, I categorically deny the assertion. I made no representations to Cozean in this regard."). Accordingly, genuine issues of material fact preclude summary judgment and Plaintiff's motion for summary judgment regarding this set of alleged misrepresentations is DENIED.

### iv. Representations regarding an agreement to reduce royalty rates

Plaintiff claims that in order to further induce IBD to execute the Asset Purchase Agreement, Micceri represented to Cozean that he would sign a memorandum of understanding

15

reflecting an agreement between the parties to reduce the royalty rates. Pl.'s Mem. at 16. Micceri directly denies making that representation. Defs.' Counter 56.1, ¶¶ 44–46. Moreover, Plaintiff does not cite any direct evidence of Micceri's alleged statements. Instead, Plaintiff relies on Cozean's testimony that Berkowitz represented to Cozean that (1) he could get Micceri to sign the memorandum of understanding, and (2) Micceri promised Berkowitz that he would sign the memorandum of understanding. Cozean Dep. 40:4-13 ("Jeffrey insisted that he could go back to [Micceri], and [Micceri] could change the [memorandum of understanding], put it back the way it was."); Cozean Dep. 40:14-19 ("Two days later, it still wasn't done, and Jeffrey came and said, if we don't pay Mates Fisher today, we are going to lose all the assets. But [Micceri] promised me he would sign this agreement, and we went forward with the agreement on those conditions."). Because Plaintiff has failed to submit any undisputed evidence of Micceri's alleged statements, and Micceri denies having made the representations, genuine issues of fact preclude summary judgment and this portion of Plaintiff's motion is DENIED.

In order to prevail on its fraud and negligent misrepresentation claims against Micceri, Plaintiff must prove that Micceri made misrepresentations in the first place. As stated, whether Micceri made the four misrepresentations Plaintiff alleges is disputed. Accordingly, summary judgment of Plaintiff's fraud and negligent misrepresentation claims against Micceri is precluded and Plaintiff's motion is DENIED.

## IV. Conclusion

For the reasons set forth above, Plaintiff's motion for partial summary judgment is DENIED. The Clerk of the Court is respectfully directed to terminate the motion, Doc. 223.

It is SO ORDERED.

Dated: October 23, 2017
       New York, New York

                                                    Edgardo Ramos, U.S.D.J.
                                                    United States District Judge