**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

INNOVATIVE BIODEFENSE, INC.,                    12 CIV. 3710 (ER)

                Plaintiff,

    - against -

VSP TECHNOLOGIES, INC., SAN-MAR
LABORATORIES, INC., AND CARLO MICCERI,

              Defendants.
--------------------------------------------------------------------X

VSP TECHNOLOGIES, INC., and CARLO MICCERI,

              Third-party Plaintiffs,

    - against -

BDS SOLUTIONS, LLC, BDS TECHNOLOGIES, LLC,
AND BIODEFENSE INTERNATIONAL, INC.,

              Third-party Defendants.

---

### MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY AND RELATED EVIDENCE

---

COLE SCHOTZ P.C.
*Attorneys for*
*Defendants/Counterclaimant/Third-*
*Party Plaintiffs,*
*VSP Technologies and Carlo Micceri*
1325 Avenue of the Americas
19th Floor
New York, New York 10019
(212) 752-8000

Of Counsel and on the Brief:
    Jamie P. Clare
    Joseph Barbiere

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

LEGAL ARGUMENT .................................................................................................................. 8

    I.        LEGAL STANDARD ............................................................................................ 8

    II.      DR. BARBARA C. LUNA MUST BE PRECLUDED FROM
           TESTIFYING REGARDING ALLEGED LOST PROFITS .............................. 10

    III.    MORRIS WAXLER AND SUSAN GOLDSBERRY SHOULD BE
           PRECLUDED FROM TESTIFYING AS TO THE OPINIONS SET
           FORTH IN THEIR REPORTS BECAUSE THEIR PROFFERED
           TESTIMONY IS IRRELEVANT TO THE ISSUES TO BE TRIED AND
           WOULD BE, AMONG OTHER THINGS, UNDULY PREJUDICAL TO
           DEFENDANTS AND CONFUSING TO THE JURY IF ALLOWED. .............. 16

CONCLUSION ........................................................................................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entertainment*,
  566 F.Supp.2d 305 (S.D.N.Y. 2008).....................................................................12

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002)...............................................................................9

*Bank of New York Mellon Tr. Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*,
  910 F. Supp. 2d 629 (S.D.N.Y. 2012)..........................................................16, 20

*Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*,
  239 F.3d 179 (2d Cir. 2001)...............................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)...................................................................................10, 23

*In re Fosamax Prod. Liab. Litig.*,
  924 F. Supp. 2d 477 (S.D.N.Y. 2013)................................................................17

*Great Earth Intern. Franchising Corp. v. Milks Development*,
  311 F. Supp.2d 419 (S.D.N.Y. 2004).................................................................11

*Highland Capital Mgmt., L.P. v. Schneider*,
  551 F. Supp. 2d 173 (S.D.N.Y. 2008)..................................................................8

*Kenford Co. v. County of Erie*,
  *supra*, 493 N.E.2d at 235 ...............................................................................14

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007)................................................................16

*Marx & Co. v. Diners' Club Inc.*,
  550 F.2d 505 (2d Cir. 1977)..............................................................................20

*In re Refco Inc. Sec. Litig.*,
  2012 WL 7007795 (S.D.N.Y. Nov. 29, 2012)....................................................23

*RMLS Metals, Inc. v. IBM*,
  874 F. Supp. 74 (S.D.N.Y. 1995)..........................................................14, 15, 16

*Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*,
  321 F. Supp. 2d 469 (N.D.N.Y. 2004)...............................................................20

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000)...................................................................10, 11, 13, 14

*Scott v. Chipotle Mexican Grill, Inc.*,
    315 F.R.D. 33 (S.D.N.Y. 2016) ...........................................................................20

*Trademark Research Corp. v. Maxwell Online, Inc.*,
    995 F.2d 326 (2d Cir. 1993)............................................................................11, 14

*United States v. Bermudez*,
    529 F.3d 158 (2d Cir. 2008).....................................................................................8

*United States v. Williams*,
    506 F.3d 151 (2d Cir. 2007).....................................................................................8

**Other Authorities**

Federal Rules of Evidence 401 ....................................................................................16

Federal Rules of Evidence 403 .............................................................................8, 17

Federal Rules of Evidence 702 ........................................................................8, 9, 17

## PRELIMINARY STATEMENT

Plaintiff Innovative Biodefense, Inc. ("IBD" or "Plaintiff") had disclosed three proposed expert witnesses in connection with the upcoming trial of this matter.  The testimony of two of those experts, Morris Waxler and Susan Goldsberry, should be excluded entirely, while the testimony of a third, Dr. Barbara Luna, should be excluded in part.

IBD disclosed Dr. Luna as a damages expert, and as part of her proffered testimony, as reflected in her November 12, 2014 report, she calculates lost profits that IBD is alleged to have suffered as a result of the actions of VSP Technologies Inc. ("VSP") and its principal, Carlo Micceri ("Micceri," and, hereinafter collectively with VSP, "Defendants").  Any evidence of IBD's alleged lost profits, however, must be excluded from the trial of this matter.  As the relevant cases make clear, a party seeking lost profits has the burden of proving the existence and amount of its loss of profits with reasonable certainty – and where a new business venture is involved, like IBD, any such claim is subject to even greater scrutiny.  The outrageously-inflated lost profits calculations reflected in Dr. Luna's report are unduly speculative, and are based on a multitude of assumptions, taken from IBD's own projections, that plainly fail to provide the requisite certainty for admissibility.  Moreover, the sublicensing agreements at issue between VSP and IBD's predecessor-in-interest clearly do not provide for, nor do they contemplate, an award of lost profits in the event of a breach by VSP.   In fact, the provisions contained in those agreements reveal quite the opposite intention.

The testimony proffered by IBD from Mr. Waxler and Ms. Goldsberry both deal with the legal compliance of products that were allegedly produced with Defendants' formulas.  The opinions set forth in their reports, however, have no bearing on the ultimate issues to be tried in this matter in light of the pending existing claims, so they are entirely irrelevant.  Moreover, any and all legal compliance responsibilities have already been determined in this case through the

Court's first summary judgment decision to have been the responsibility of IBD, and not

Defendants, under the applicable agreements.   Further, any potential relevancy of Mr. Waxler's

proposed testimony is greatly outweighed by its potential to unduly prejudice Defendants, to

confuse the actual issues before the jury and to potentially mislead and confuse the jury.

Finally, the second portion of Ms. Goldsberry's report, which suggests that IBD had not

infringed any of VSP's patents is also irrelevant to any issues extant in this matter, as there

remain no claims currently in this case relating to patent infringement or trade secret violations.

In light of the foregoing, and for the reasons set forth and discussed in detail below, IBD's

proposed expert testimony must be excluded from the trial of this matter.

## STATEMENT OF FACTS

In or around 2009, VSP Technologies Inc. ("VSP") entered into a series of sublicense patent agreements with BDS Solutions LLC, BDS Technologies LLC, and Biodefense International Inc. (hereinafter, collectively "BDS"), granting BDS the right to develop and manufacture certain antimicrobial products and to engage in the subsequent wholesale and retail distribution of the same (the "Sublicense Agreements"). (Clare Decl. Ex. A.)[1] The Sublicense Agreements were entered into after a series of negotiations between VSP and BDS wherein VSP agreed to license its exclusive rights to certain technology developed by Columbia University (the "Columbia Technology") in exchange for fair market value. (*Id.*)

The Sublicense Agreements specifically identified the rights and obligations of the parties, including the parties' obligations with respect to compliance with state and federal laws. In particular, the Sublicense Agreements provided, in pertinent part:

> BDS further acknowledges that BDS will be fully responsible for the development of all products and for complying with all applicable federal and state laws and regulations regarding the development, manufacturing, distribution, marketing, advertising, promotion and sale of the Licensed Products.

> [*Id.* Ex. A, Section 2.5]

Moreover, Section 10.2 of the Sublicense Agreements states:

> BDS agrees to comply with all applicable federal, state and local laws and regulations regarding development, testing, manufacture, marketing, promotion and sale of the Licensed Products.

> [*Id.* Ex. A, Section 10.2.]

---

[1] The facts are derived from Defendants' Rule 56.1 Counterstatement of Material Facts filed with the Court on May 16, 2017. *See* Dkt. No. 245.

At some point prior to June 2011, BDS became delinquent in the payment of royalties to VSP under the Sublicense Agreements. BDS then entered into an "intention to sell/purchase agreement" with Mates Fischer Group ("Mates Fischer"). Mates Fischer fronted monies to BDS which were used in part by BDS to pay a portion of the arrears to VSP. BDS, however, remained in financial turmoil.

In an effort to buy its way out of the Mates Fischer agreement, BDS entered into negotiations and eventually executed an agreement with plaintiff, Innovative Biodefense, Inc. ("IBD"), purporting to be an Asset Purchase Agreement dated June 1, 2011 (the "Asset Purchase Agreement"). (Clare Decl. Ex. B.) Pursuant to the Asset Purchase Agreement, IBD was to pay BDS a sum of money which would allow BDS to cancel its agreement with Mates Fischer. In addition, pursuant to § 2.1(iii-iv) of the Asset Purchase Agreement, IBD agreed to pay BDS's outstanding balance to VSP, which amounted to $500,000 as of the date of closing, and IBD assumed all financial obligations of BDS to VSP from June 1, 2011 forward. BDS was also provided with stock in IBD, a new company. As a result of the Asset Purchase Agreement, IBD succeeded to BDS's rights and obligations under the Sublicense Agreements with VSP.

The parties' business relationship soon deteriorated, and on or about May 9, 2012, IBD commenced this action against VSP, VSP's principal Carlo Micceri ("Micceri," and together with VSP, "Defendants"), and San-Mar Laboratories, Inc., which had been the manufacturer of the sublicensed products for BDS. (*Id.*) IBD claimed breach of contract and breach of the implied covenant of good faith and fair dealing against Defendants, and several fraud/misrepresentation-based claims and a tortious interference claim against just Micceri. Thereafter, on or about December 20, 2012, Defendants filed an amended answer and counterclaims against IBD, and a third-party complaint against BDS.

4

On March 31, 2016, this Court issued an Opinion and Order, granting IBD's motion for summary judgment in part, denying the motion in part, and denying Defendants' motion for summary judgment in its entirety (the "First SJ Opinion"). *See* Dkt. No. 206. As a result, Defendants' counterclaims regarding patent infringement and/or trade secret violations were dismissed. VSP's sole remaining claims against IBD are for breach of contract and for attorney's fees, costs and disbursement. In effect, all of the remaining claims between the parties relate to the parties' alleged performance (or non-performance) under the Sublicense Agreements, their actions leading up to the Asset Purchase Agreement, and the assignment of the Sublicense Agreements from BDS to IBD. (*Id.*) On October 24, 2017, after IBD again moved for summary judgment on certain of its affirmative claims, this Court issued another Opinion and Order, denying IBD's motion in its entirety (the "Second SJ Opinion"). *See* Dkt. No. 263.

**IBD's Expert Witness Disclosures.**

On or around November 17, 2014, IBD served an expert witness disclosure, which included three (3) separate expert reports. (Clare Dec., Exs. C-E.) To date, IBD has not updated or supplemented its expert disclosures.

### A.    **Dr. Barbara C. Luna's Report**

Dr. Barbara C. Luna ("Luna") provided a report to IBD, dated November 12, 2014, opining on the potential damages IBD has allegedly suffered and using two separate approaches: 1) Out-Of-Pocket Expenses; and 2) Lost Profits. (Clare Dec., Ex. C, at p. 9.)

Luna relies on IBD's speculative forecasts from 2011 and 2014 in calculating her lost profits figures. (*Id.* at p. 13.) Luna states that she "analyzed profits IBD had expected in a given year (the but-for profits from its June 2011 projections) as compared to the profits that IBD has earned since 2011 and now expects to earn through 2019 (from its October 2014 projects) and considered the reasonableness of IBD's projections in light of securing over $100 million in

signed orders in calendar 2014." (*Id.* at p.14.)   Luna claims she was able to project the amount of profits IBD could have potentially made years in the future based on projected differences between IBD's EBITDA in any given year. (*Id.* at pp. 14-15.)  Based on these projections, Luna contends that IBD lost profits of $66,246,840 over a five year period – from 2014 through 2019. (*Id.* at p. 16.)

### B.    Morris Waxler's Report

Morris Waxler ("Waxler") states in his report that he was retained to "provide [an] expert opinion on actions (criminal and civil) [the] FDA could take against IBD for selling topical over-the-counter (OTC) antimicrobial drugs in the United States that are not compliant with FDA regulations." (Clare Decl., Ex. D, p. 4.)   In connection with his retention, Waxler was to "describe FDA regulations" and opine as to whether the know-how "provided by Defendants to IBD is sufficient to enable IBD to be compliant with FDA requirements." (*Id.*)

Waxler's report details various FDA regulations on management responsibility, labeling requirements, and quality control standards. (*Id.* pp. 4-19.)  After quoting numerous regulations, Waxler opines that "Mr. Micceri, BioDefense Solutions, and San Mar Laboratories knowingly manufactured, packaged, and distributed adulterated and misbranded topical antiseptic drugs, the Zytrel Products." (*Id.* at 29.)   Waxler contends this conclusion is correct because "Defendants did not provide systematic documentation of compliance with FDA regulations in any core areas: management; materials; laboratory controls; facilities and equipment; production; and, packaging and labeling." (*Id.* at 19.)  Although Waxler recognizes that the FDA never issued any violations to IBD or Defendants, Waxler nevertheless contends that the government "could have" issued penalties if violations were found. (*Id.* at 29.)

C.    **Susan Goldsberry's Report**

At the time of her November 12, 2014 report, Susan Goldsberry ("Goldsberry") was the President and CEO[2] of Benchmark Cosmetic Laboratories ("Benchmark"). (Clare Decl., Ex. E, p. 2.) Goldsberry's report states that Benchmark was retained to conduct certain testing of products manufactured by San-Mar Laboratories ("San-Mar"). (*Id.*) According to Goldsberry, Benchmark tested a total of four products manufactured by San Mar. (*Id.* pp. 2-4.) Goldsberry states that two of the four products were found to be "unstable." (*Id.* at pp. 3-4.) Interestingly, Goldsberry does not provide any supporting documentation as to the products Goldsberry claims to have failed the stability testing. (*Id.*)

In addition to testing San-Mar products, Goldsberry states that Benchmark was retained to "develop three products and produce a batch of a fourth product." (*Id.* at p. 4, ¶ D.1.) Goldsberry claims that through various experiments and testing, Benchmark developed new products for IBD. Goldsberry concluded her report stating that, in her opinion:

> [T]he products for IBD were developed following a normal development process, to meet industry requirements and client specifications. Neither I nor any member of my development team reviewed the Columbia patents during the development process, and were not informed of any "trade secrets" (certain patents later identified as having been assigned to Columbia University and licensed to IBD) from IBD.
>
> [*Id.* at p. 6, ¶ D.9.]

---

[2] As with the other reports submitted by IBD, Goldsberry's report was prepared in 2014 and no supplemental report has been provided.

## LEGAL ARGUMENT

### I.    LEGAL STANDARD

A district court's inherent authority to efficiently manage the course of its trials includes the right to rule on motions *in limine*.  *See Highland Capital Mgmt., L.P. v. Schneider*, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008) (citing *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984)). "Indeed, '[t]he purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'"  *Id.* (quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)).  The Second Circuit has instructed that in ruling on motions *in limine*, the "[d]istrict courts have broad discretion to balance value against possible prejudice" under Federal Rules of Evidence 403, which provides that otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  *See United States v. Bermudez*, 529 F.3d 158, 161 (2d Cir. 2008); Federal Rules of Evidence 403.

With regard to expert testimony, "the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied . . . ."  *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citing *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 593 n.10 (1993)).  Federal Rules of Evidence 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and
methods; and

(d)    the expert has reliably applied the principles and methods
to the facts of the case.

[*See* Federal Rules of Evidence 702.]

"[T]he Supreme Court has made clear that the district court has a 'gatekeeping' function under Rule 702—it is charged with 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (*quoting Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S.579, 588 (1993) (internal quotation marks omitted)). As a "gatekeeper," the district court must first analyze the proffered testimony to determine, in the first instance, if it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.,* 239 F.3d 179, 184 (2d Cir. 2001) (*quoting* Federal Rules of Evidence 401.).

If the proffered testimony meets that threshold, the district court must then undertake an analysis to determinate whether the theories underlying the testimony are based on a "reliable foundation," which includes: "(1) whether a theory or technique 'can be (and has been) tested'; (2) 'whether the theory or technique has been subjected to peer review and publication'; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards controlling the technique's operation'; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 594–95). "The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The

9

focus, of course, must be solely on principles and methodology, not on the conclusions that they

generate." *Daubert*, *supra*, 509 U.S. at 594–95.

## II.    DR. BARBARA C. LUNA MUST BE PRECLUDED FROM TESTIFYING REGARDING ALLEGED LOST PROFITS

### A.    <u>Dr. Luna's lost profits testimony should be precluded because her analysis is based on speculation, forecasts and assumptions, and cannot be proven with reasonable certainty.</u>

It is undisputed that, at the time of Dr. Luna's report, IBD was a fledgling business,

which in its first few years of business, from 2011 through 2014, had only lost money.  Despite

these undisputed facts, Dr. Luna, in her November 12, 2014 report, "conservatively" projected

that over the next five years, from 2015 through 2019, IBD would have earned profits in the

present-value amount of $66,246,840 but for Defendants' alleged wrongful actions.  In an

incredibly bold prediction, Dr. Luna projected that in June 2015, IBD's revenues would increase

by 18,547%(!), from $221,000 in actual sales the year before, to $44,666,000 in sales by June

2015.  (See Clare Decl., Ex. C, Sched. 3.1).  Thereafter, per Dr. Luna, IBD's annual revenue

would increase steadily over the next five years, such that by June 2019, IBD would be selling

$195,000,000 worth of products.  (*Ibid*.)  Dr. Luna bases those numbers, however, on IBD's

own October 2014 financial projections, and compares them, for lost profits purposes, against

IBD's own June 2011 projections.   On their face, these inflated and outrageous projections and

the conclusions Dr. Luna draws from them, defy all common sense and logic.   It is precisely for

that reason that courts are generally disinclined to allow a new business to make a claim for lost

profits resulting from a breach of contract, or otherwise.

"In action for breach of contract, a plaintiff is entitled to recover lost profits <u>only if he can</u>

<u>establish both the existence and amount of such damages with reasonable certainty</u>." *Schonfeld*

*v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) (emphasis added).  "'The damages may not be

merely speculative, possible or imaginary.'" *Ibid.* (quoting *Kenford Co. v. County of Erie*, 493 *N.E.*2d 234, 235 (N.Y. 1986)).   A lost profits calculation must be based on "known reliable factors without undue speculation." *Ibid.*   "Therefore, **evidence of lost profits from a new business venture receives greater scrutiny because there is no track record upon which to base an estimate**." *Ibid.* (emphasis added).    "Projections of future profits based upon a 'multitude of assumptions' that require 'speculation and conjecture' and few known factors do not provide the requisite certainty." *Ibid.* (quoting *Kenford*, *supra*, 493 N.E.2d at 236).   "Most of the leading cases which have decided on claims of future lost profits have ruled that they are not recoverable." *Great Earth Intern. Franchising Corp. v. Milks Development*, 311 F. Supp.2d 419, 432 (S.D.N.Y. 2004).

Here, at the time of Dr. Luna's report, VSP had no track record upon which to base a lost profits calculation – particularly such an outrageous projection in the tens of millions of dollars per year for a business that had never previously turned a profit.  Any limited track record that VSP did have over the few years prior to Dr. Luna's report showed only negative earnings.   Dr. Luna's entire analysis is based on VSP's "projections" from 2011 and 2014, which themselves rely on a "multitude of assumptions" that, by their very nature, required Dr. Luna to speculate, as of November 2014, as to any future profits that VSP may have been able to generate.  As the Second Circuit noted in *Schonfeld*, in rejecting a plaintiff's lost profits claim based on projections in that plaintiff's business plan, "[t]he entrepreneur's 'cheerful prognostications' are not enough" to sufficiently establish the existence of lost profits.   218 F.3d at 173-174 (quoting 1 *Dobbs Law of Remedies* § 3.4).   *See also Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 332-334 (2d Cir. 1993) (affirming trial court's dismissal of lost profits claim which "depended entirely on speculation of a particularly dubious kind" and lacked a historical

11

basis for the projections relied upon, including a "hope against hope" that claimant's market share would expand in the face of consistently poor performance); *24/7 Records, Inc. v. Sony Music Entertainment*, 566 F.Supp.2d 305, 316 (S.D.N.Y. 2008) (dismissing lost profits claims of a start-up record production company for being "entirely speculative" and not capable of measurement with reasonable certainty, and noting the company had only been operating for 17 months and had reported losses on its previous two tax returns).    Dr. Luna's report on lost profits flatly fails to provide the requisite certainty to allow her lost profits testimony to be admitted in this case on behalf of a new business venture, such as VSP.

In fact, in the APA itself, IBD warned BDS of its "highly risky investment" in IBD. Clare Decl., Ex. B, § 4.12.3 and Schedule 4.12.3.  In connection with BDS's acquisition of stock in IBD under the APA, IBD required BDS to acknowledge that "the investment in and acquisition of the Shares [in IBD] involves substantial risk.  [BDS] has reviewed and understands the investment risks set forth in Schedule 4.12.3 attached hereto."   That Schedule then goes on to identify 5 pages of risk factors associated with IBD's business, which make the ownership of IBD shares "highly risky."   Among other things, IBD notes in the Schedule that it has "no operating history on which to base an evaluation of our business and prospects," "that there can be no assurance that we will ever achieve profitability or, if profitability is ever achieved, that it can be sustained," and that "[b]ecause of our limited operating history and the highly competitive nature of the markets in which we intend to compete, we are unable to forecast accurately for future revenues."   Thus, IBD itself, via its Schedule 4.12.3, acknowledges that a lost profits analysis for IBD would be highly speculative, and fails to provide anything close to the reasonable certainty required to allow such a claim.

It also must be noted that while Dr. Luna bases her lost profits analysis on IBD's October 2014 projections (as compared to IBD's 2011 projections), her November 2014 report has never been supplemented to reflect an updated lost profits opinion based on IBD's **actual** revenues over the past three years.   Did IBD, in fact, meet the projected 18,547% increase in revenues in 2015?[3]   Had IBD earned the $44 million dollars, plus, in profits by June 2017 as projected by Dr. Luna in her report, when comparing the profits she claims IBD would have earned (per its 2011 projections) had IBD been producing products using VSP's "know-how" (which IBD claims was defective), versus what IBD would have earned in the future (from IBD's 2014 projections) from products that is claims it had developed itself?  Without actual performance figures that would support Dr. Luna's proffered testimony of a loss actually caused by VSP's failure to provide it with the subject "know how" with reasonable certainty, her testimony should be excluded.

For all of the foregoing reasons, any and all evidence that would be offered at trial by IBD to support a claim of lost profits, including, but not limited to, Dr. Luna's testimony, should be excluded from the trial of this matter.

> **B.** **Dr. Luna's lost profits testimony should also be precluded because the parties did not fairly contemplate lost profits damages at the time of contracting.**

As part of its stringent requirements for the recovery of lost profit damages for breach of contract, New York law also requires a showing that the damages sought were within the contemplation of the parties to the contract at the time the contract was made.  *Schonfeld*, *supra*,

---

[3] Dr. Luna claims she relied, in part, on sales orders and "large bookings" that were in place (though not yet fulfilled) around the time she authored her report.   Were these orders ever fulfilled and paid for?   We note that the entity alleged to have made the largest of the sales orders, Oceans Five Merchants, Inc., was formed in Florida in September 2013, not long before the first alleged "large booking," and was dissolved within one year, in September 2014, not long after its final alleged "large booking."   *See* Clare Decl., ¶ 7, Ex.  F.

218 F.3d at 172 (2d Cir. 2000); *RMLS Metals, Inc. v. IBM*, 874 F. Supp. 74, 75 (S.D.N.Y. 1995);

*Kenford Co. v. County of Erie*, *supra*, 493 N.E.2d at 235.  Absent a contractual provision

governing the availability of lost profits damages as a remedy for breach, New York law requires

the plaintiff seeking such damages prove that the parties would have provided for lost profit

damages if they had considered the subject.  *Trademark Research Corp.*, *supra*, 995 F.2d at 334.

To determine what the parties would have concluded, the Court considers the nature, purpose

and particular circumstances of the contract as known by the parties and what liability the

defendant fairly may be supposed to have consciously assumed.  *Great Earth Int'l Franchising*

*Corp.*, *supra.* (citing *Kenford Co. v. County of Erie*, 537 N.E.2d 176 (1989) (*Kenford II*)).

It is clear that the parties did not contemplate that BDS would be entitled to lost profits

in the event of any breach of the Sublicense Agreements by VSP.  First, the Sublicense

Agreements are silent on the subject and do not provide any clause indicating that such profits

would be available to BDS (and now IBD) in the event of a breach.  Indeed, the only mention of

lost profits is in the indemnification provisions applicable to third-party claims, and in that

provision each side <u>refused</u> to indemnify the other against lost profits, consequential damages or

punitive damages.  Sublicense Agreements, ¶ 30.  Second, the Sublicense Agreements do not

provide for any guaranteed or expected sales by BDS, nor do they contain any minimum sales

volumes to be achieved by BDS, including, for instance, to trigger the payment by them of

royalties to VSP.  Significantly, BDS (and later IBD) could not realize any profits under the

Sublicense Agreements themselves; they were simply licensing a technology pursuant to those

agreements to be used in their business, which may or may not prove successful for a variety of

reasons.  *See Schonfeld*, *supra*, 218 F.3d at 175 (excluding expert testimony and dismissing

claims seeking lost profits where plaintiff was not seeking profits that would have accrued under

the contract the defendant was accused of breaching).   It is not enough to support a claim for lost

profits that BDS may have anticipated earning profits from sales based on the technology it was

licensing; IBD has to demonstrate that BDS specifically contemplated at the time it entered into

the contract that it would be able to recover lost profits damages if there were a breach by VSP

and that VSP assumed such liability.  *Great Earth Int'l Franchising Corp.*, *supra*, 211 F.

Supp.2d at 435.   Here, given the terms of the contracts and the purposes of the contracts, IBD

cannot demonstrate the parties to the Sublicense Agreements (VSP and BDS) intended BDS to

be able recover lost profits damages in the event of a breach by VSP and, thus, any testimony by

IBD's proposed damages expert as to lost profit damages should be excluded.  *See RMLS Metals*,

*supra*, 874 F. Supp. at 77.

Further, the terms of the Sublicense Agreements themselves fail to provide any certainty

or basis for IBD's claims for lost profit damages.  VSP was simply licensing technology to BDS

without any guarantees that BDS would be able to produce a product using that technology or

earn any profits from sales of products containing the technology.   On the contrary, the

Sublicense Agreements provide certainty only as to what <u>VSP</u> was to earn under the contracts in

the form of royalties and a license fee, including minimum monthly non-refundable royalties

even if no product was developed or sold.  Sublicense Agreements, ¶ 3 and Schedules 3.2 and

3.3.  The Sublicense Agreements do not address at all what BDS (and later IBD) would or could

earn as a result of the contracts, if anything.  The contracts set no minimum payments owed to

BDS or to be earned by BDS, and do not provide any guaranteed sales or expected sales figures

for BDS.  *See RMLS Metals*, *supra*, 874 F. Supp. at 76 (holding plaintiff could not recover lost

profit damages as a matter of law and stating the "absence of a volume term, or a minimum

payment term, makes it impossible to calculate the amount of lost profits from the contract

itself"). On the contrary, the Sublicense Agreements contemplated that it was possible BDS may not have any licensed products for sale by certain time periods, and under those circumstances, VSP had the option to terminate the license granted or convert the license to a non-exclusive license. Sublicense Agreements, ¶¶ 3.6-3.8. IBD's alleged lost profits certainly cannot be calculated from the Sublicense Agreements themselves (unlike VSP's damages). IBD, by offering its damages expert's testimony as to lost profits, is simply asking this Court to fabricate those numbers "out of whole cloth," which the Court cannot do under New York law. *See RMLS Metals*, *supra*, 874 F. Supp. at 77.

III.   **MORRIS WAXLER AND SUSAN GOLDSBERRY SHOULD BE PRECLUDED FROM TESTIFYING AS TO THE OPINIONS SET FORTH IN THEIR REPORTS BECAUSE THEIR PROFFERED TESTIMONY IS IRRELEVANT TO THE ISSUES TO BE TRIED AND WOULD BE, AMONG OTHER THINGS, UNDULY PREJUDICAL TO DEFENDANTS AND CONFUSING TO THE JURY IF ALLOWED.**

IBD should be precluded from calling Morris Waxler and Susan Goldsberry as expert witnesses, as their proposed expert testimony is wholly irrelevant. The opinions set forth in Waxler's and Goldsberry's reports have no bearing on the ultimate issues to be tried in this matter in light of the pending existing claims. Federal Rules of Evidence 401 provides that "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." When evidence proffered is irrelevant, it "is not admissible." Federal Rules of Evidence 402. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Bank of New York Mellon Tr. Co., Nat. Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 641 (S.D.N.Y. 2012) (*quoting Daubert*, 509 U.S. at 591); *see also Malletier v. Dooney & Bourke, Inc.,* 525 F. Supp. 2d 558, 601 (S.D.N.Y. 2007) (excluding an expert's testimony

because survey he was retained to conduct was not relevant to issues in case and was thus inadmissible under Federal Rules of Evidence 403 and 702).

In addition, Federal Rules of Evidence 403 provides that the "court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Federal Rules of Evidence 403; *see also In re Fosamax Prod. Liab. Litig.*, 924 F. Supp. 2d 477, 495 (S.D.N.Y. 2013) (finding that expert testimony as to potential jaw amputation was irrelevant and therefor inadmissible as it was undisputed that no such surgery was needed or contemplated).  As detailed herein, Waxler and Goldsberry should be precluded from testifying because their proffered testimony is irrelevant and prejudicial.

<b>A.    Morris Waxler's Conclusions Regarding Violations Of FDA Regulations Are Not Relevant to the Issues to the Tried, Constitute Impermissible Legal Conclusions, and Would Also, Among Other Things, Be Unfairly Prejudicial, Confuse the Issues, and Mislead the Jury.</b>

Waxler's proffered testimony has no relation to legal issues to be determined at trial in this matter.  Waxler's Report states that he was retained to "provide [an] expert opinion on actions (criminal and civil) [the] FDA could take against IBD for selling topical over-the-counter (OTC) antimicrobial drugs in the United States that are not compliant with FDA regulations." (Clare Decl., Ex. D, p. 4.)  After a review of documentary evidence, Waxler concluded that "[t]he Federal government **could have** leveled severe penalties against the Plaintiff as well as the Defendants" if the Products were marketed and sold prior to becoming FDA compliant.  (*Id.* at p. 29 (emphasis added).)  Not only is this unsubstantiated legal conclusion based purely on speculation but, more importantly, the entire report opines on issues that **are not relevant to this matter**, militating in favor of precluding Waxler from testifying in this case.

17

As discussed above, the crux of this dispute involves the parties' rights and obligations under the Sublicense Agreements for certain patented technology.  In exchange for providing the exclusive licensing rights to BDS (which were ultimately assigned to IBD), VSP was entitled to royalty and license fees.  *See* Dkt. No. 245, p. 44.  After extensive negotiations, the parties signed the Sublicense Agreements, which detail all of the parties' rights and obligations thereunder, including the obligation to be compliant with any and all federal and state laws.  In fact, the Sublicense Agreements specifically state:

> BDS further acknowledges that **<u>BDS will be fully responsible</u>** for the development of all products **<u>and for complying with all applicable federal and state laws and regulations</u>** regarding the development, manufacturing, distribution, marketing, advertising, promotion and sale of the Licensed Products.

> [*See* Clare Decl. Ex. A, Section 2.5 (emphasis added).)

The Sublicense Agreements further state:

> BDS agrees to comply with all applicable federal, state and local laws and regulations regarding development, testing, manufacture, marketing, promotion and sale of the Licensed Products.

> [*See* Clare Decl. Ex. A, Section 10.2.]

Under the explicit terms of the Sublicense Agreements, VSP had no obligations with regard to FDA regulations or to ensure a compliant product.  Rather, it was BDS, and after the Asset Purchase Agreement, IBD, which was responsible for making sure all products developed complied with all state and federal laws.  Section 2.5 and 10.2 of the Sublicense Agreements make certain that it is entirely immaterial whether VSP complied with FDA regulations.  Interestingly, IBD has **<u>conceded</u>** this point, recognizing that "the Sublicense Agreements put the onus on IBD to comply with FDA regulations."  Dkt. 194 p. 8.

Here, Waxler was specifically retained to opine as to the consequences for producing a product that is noncompliant with FDA regulations. (Clare Decl., Ex. D, p. 4.) As the Sublicense Agreements make clear, it was not VSP's responsibility to ensure governmental compliance and, thus, any testimony on that subject is not relevant because it fails to relate to any issue to be tried in this matter as against VSP.

In fact, this Court has flatly rejected IBD's arguments concerning VSP's purported failures with regard to the manufacture of products compliant with FDA regulations. On March 31, 2016, in this Court First SJ Opinion, in denying IBD's motion for summary judgment as to Defendants' breach of contract counterclaim, this Court quoted Sections 2.5 and 10.2 of the Sublicense Agreements and determined that VSP had no obligations to produce FDA compliant products. Dkt. No. 206 p. 23. Rather, this Court recognized that the obligation was exclusively with BDS and/or IBD and, thus, determined that any evidence that the products manufactured using the formulas and know-how provided by VSP were not FDA compliant "does not establish, as a matter of law, that VSP materially breached the Sublicense Agreements excusing IBD's performance." *Id.*

This Court further rejected IBD's remaining arguments concerning the purported noncompliance with FDA regulations, finding:

> While IBD attempts to counteract this obligation by pointing out that the Sublicense Agreements also require VSP to make available all know-how "'useful or necessary' for IBD to utilize the technology" **this obligation does not amount to a guarantee that the know-how alone will result in a compliant product.** Moreover, IBD's contention that it retained no benefit from the Assert Purchase Agreement and Sublicense Agreements is belied by its requests to renew the Sublicense Agreements.

> [Dkt No.206, p. 23(emphasis added).]

Stated simply, this Court has already determined that VSP had no obligation to provide materials that resulted in a product compliant with governmental regulations. Thus, the very issue on which Waxler's testimony has been proffered is not relevant to any evidence or to any fact in dispute in the case, making any testimony regarding FDA regulation compliance entirely irrelevant to this matter. *See Bank of New York Mellon Trust Co*., 910 F. Supp. 2d at 641 (noting that Federal Rules of Evidence 702 requires that an expert's evidence or testimony "assist the trier of fact to understand the evidence or to determine **a fact in issue**.").

Furthermore, it is clear from Waxler's report that IBD intends to have Waxler testify as to legal conclusions, which is wholly impermissible. *See Scott v. Chipotle Mexican Grill, Inc.,* 315 F.R.D. 33, 48 (S.D.N.Y. 2016) ("While an expert 'may opine on an issue of fact within the jury's province,' an expert 'may not give testimony stating ultimate legal conclusions based on those facts.'" (*quoting United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 480 (N.D.N.Y. 2004) ("[T]o make it abundantly clear for the parties, it is axiomatic that an expert is not permitted to provide legal opinions, legal conclusions, or interpret legal terms; those roles fall solely within the province of the court.").

After quoting numerous FDA regulations, Waxler's report concludes that the Defendants "knowingly" violated FDA regulations and "tried to induce" IBD into committing prohibited acts in violation of the FDA regulations. (Clare Decl., Ex. D, p. 29.) These conclusions are irrelevant and impermissible advocacy rather than helpful expert testimony. Not only is VSP's compliance with governmental regulations *not* at issue here since it had no obligations in that regard, but even if it were, it is not within a witness's rightful province to provide these legal conclusions to a jury. *See Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977)

(stating that admission of testimony as to legal conclusions "would give the appearance that the court was shifting to witnesses the responsibility to decide the case."). As such, because the bulk of Waxler's testimony would be to opine as to compliance with legal obligations, the testimony should be barred.

Even assuming this evidence were remotely relevant to a fact at issue (which it is not), the Court should nevertheless preclude the testimony as its prejudicial effect will substantially outweigh any probative value it may have. *See* Federal Rules of Evidence 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Allowing testimony that there were alleged violations of governmental regulations in connection with the production of the BDS products could have an unduly prejudicial effect on Defendants and the jury's perception of them. Moreover, the highly technical nature of such testimony would only serve to confuse the actual issues before the jury and potentially mislead and confuse the jury. Because the Court has already determined that under the Sublicense Agreements, VSP was not responsible for ensuring regulatory compliance of the sublicensed products, and because the opinions are in fact legal conclusions, the prejudice of admitting such testimony would far outweigh any potential benefit to IBD.

Accordingly, Waxler's testimony provides no relevant information that would assist the trier-of-fact but, rather, constitutes immaterial legal conclusions that are highly prejudicial, warranting the preclusion of his testimony at trial.

**B.**  **Susan Goldsberry Should Be Precluded From Testifying Because Her Opinions Are Immaterial To The Facts And Claims At Issue.**

As with Waxler, Goldsberry's testimony should be precluded because it concerns issues that are not relevant to the claims remaining to be tried in this case.  Goldsberry provides two separate opinions in her report: 1) the Products that Benchmark tested were "unstable," thereby failing to meet FDA requirements; and 2) IBD did not infringe VSP's patents. (*See* Clare Decl., Ex. E.)    Both of these issues are immaterial to the remaining claims in this matter and will not assist the trier-of-fact in determining those claims.  *See* Federal Rules of Evidence 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

First, like Waxler's proffered testimony, Goldsberry's report first opines on whether or not the products produced by SanMar for BDS were compliant with FDA regulations.  (*See* Clare Decl., Ex. E, pp. 2-4.)  In this regard, Goldsberry claims that she tested the stability of multiple products manufactured by San-Mar and concluded that two of the products were "unstable." (*Id.*)  Interestingly, however, Goldsberry failed to provide any supporting documentation as to the purported failure of these products.  (*Id.*)  Nevertheless, similar to Waxler's report, IBD relies on Goldsberry's conclusions that the sublicensed products did not comply with FDA regulations and, therefore, violated the Sublicense Agreements.  (*See* Dkt. 174, p. 8.)  As fully detailed above, this issue is entirely irrelevant and highly prejudicial as this Court has already found that the plain language of the Sublicense Agreements did not obligate VSP to provide FDA compliant products.  (*See* Dkt No.206, p. 23.)   Thus, for the substantially the same reasons that Waxler's testimony should be precluded, Goldsberry should be barred from testifying as to whether or not VSP complied with FDA regulations.

Second, the portion of Goldsberry's report suggesting that no infringement of VSP's patents took place is equally irrelevant to this matter. Goldsberry's report concludes that "the products for IBD were developed following a normal development process, to meet industry requirements and client specifications" and, thus, she believes there was no patent infringement or violations of trade secret law. (Clare Decl., Ex. E, pp. 6-8.) This conclusion, however, is entirely irrelevant to the claims to be tried because no patent infringement or trade secret claims remain in this case. *See* Dkt. 206. Pursuant to the Court's First SJ Opinion, Defendants' claims for violations of patent and trade secret law were dismissed. *Id.* As such, opinions and testimony as to whether or not IBD impermissibly used Defendants' patented technology does not relate to any pending claim in this proceeding. *See In re Refco Inc. Sec. Litig.,* , 2012 WL 7007795, at *4 (S.D.N.Y. Nov. 29, 2012), ("To the extent the experts here are opining about the *merits* of dismissed claims, they fail the *Daubert* "fit" requirement for the simple reason that those merits have already been determined and are no longer relevant to the proceedings").

Accordingly, Goldsberry's testimony should be precluded as it would relate to matters that are completely irrelevant to this action.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should grant Defendants' motion to exclude the

expert testimony of Dr. Barbara C. Luna regarding IBD's alleged lost profits, and of Morris

Waxler and Susan Goldsberry, in their entirety.

Respectfully submitted,

COLE SCHOTZ P.C.
Attorneys for
*Defendants/Counterclaimant/Third-Party*
*Plaintiffs,VSP Technologies and Carlo*
*Micceri*

By:___*/s/ Jamie P. Clare*___
          Jamie Clare

DATED:  December 15, 2017